**CHARLOTTE HOUSING FOR THE ELDERLY et al., Plaintiffs,**

v.

**Andrew CUOMO, Secretary of the United States Department of Housing and Urban Development**

**and**

**The United States Department of Housing and Urban Development, Defendants.**

No. Civ.A. 98–0217 (JHG).

United States District Court, District of Columbia.

March 21, 2000.

Harry J. Kelly, III, Nixon Peabody, L.L.P., Washington, DC, for Plaintiff.

Marina Utgoff Braswell, Wilma Antoinette Lewis, Suzanne Claire Nyland, U.S. Attorney's Office, Washington, DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiffs Charlotte Housing for the Elderly ("Charlotte"), Clinton Housing for the Elderly ("Clinton"), Monroe Housing for the Elderly ("Monroe"), and Rocky Mount Housing for the Elderly ("Rocky Mount") are business partnerships that own and operate housing developments in North Carolina. All four properties share the same management company, namely Godley Management. The plaintiffs assert

that they should have received a payment and a rent adjustment under Section 801 of ·the United States Housing Act, 42 U.S.C. § 1437f. Plaintiffs allege several claims against defendants United States Department of Housing and Urban Development ("HUD") and the Secretary of HUD, Andrew Cuomo, including violations of the Administrative Procedure Act ("APA"), breach of contract, and mandamus. Both plaintiffs and defendants have filed motions for summary judgment. The Court finds that HUD did not wrongly withhold payment, and that HUD correctly determined that plaintiffs are not eligible for a rent adjustment. Accordingly, plaintiffs' motion for summary judgment is denied, and summary judgment is granted in favor of the defendants.

## I. FACTUAL BACKGROUND

In the late 1970's and early 1980's the four plaintiff partnerships entered "Housing Assistance Payment Contracts" ("HAPs") pursuant to Section 8 of the Housing Act, 42 U.S.C. § 1437. Charlotte's contract was with the Charlotte Housing Authority ("CHA"), while the other three plaintiffs entered contracts with HUD. CHA was a public housing authority that received HUD funding under Section 8, and in turn awarded assistance to Charlotte.

### A. *Section 8 and Section 801*

The Section 8 program was created to subsidize private landlords renting to low income tenants. Under the program, a "contract rent" was established for each unit, and HUD made assistance payments to compensate owners for the difference between the contract rent and the amount a tenant was actually able to pay. *See* 42 U.S.C. § 1437f(c). The contract rent was to be comparable to the rent charged for unassisted units. In order to maintain a correct rate for contract rent, HUD was to make yearly adjustments under either a "reasonable formula" to be devised by HUD, or by comparing the contract rent

to rental rates in the same housing area. *See id.* § 1437f(c)(2)(A) & (C).

HUD promulgated regulations under which an Annual Adjustment Factor (AAF) would be applied to contract rents once per year if the owner so requested, thereby increasing the contract rent. 24 C.F.R. §§ 880.609(a) & 888.200 et seq. Each year, HUD published the AAF in the Federal Register, and upon request would adjust the contract rent by multiplying it by the AAF. For example, the adjustment for a unit with a rent of $100 during a year in which the AAF equaled a 5 percent increase would result in a contract rent of $105 for the next year:

$$(1.05) \ (\$100) = \$105$$

In the 1980's, HUD became concerned that the AAF adjustments were increasing contract rents above the local rental rates. Thus, HUD began to conduct independent comparability studies of area rents, and used those rental rates as a cap on contract rates in that housing area. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 14, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). Landlords subsequently brought suit against HUD, and the Ninth Circuit ruled that the use of comparability studies to cap contract rents was unauthorized. *See Rainier View Associates v. United States*, 848 F.2d 988 (9th Cir.1988).

In response, Congress enacted Section 801 of the Department of Housing and Urban Development Reform Act, 103 Stat. 2057, which amended Section 8(c)(2)(C) of the Housing Act. Section 801 made clear HUD's authority to conduct independent comparability studies, but also placed certain requirements on the studies, and directed HUD to establish standards by which the studies would be conducted. More importantly for this case, Section 801 included a provision through which landlords could be given a lump sum in compensation for the lost rent, *see* § 801(a), and a provision which permitted a one-time adjustment to contract rents, *see*

§ 801(d), in order to bring them closer to the level they should have reached by that point in time. The plaintiffs' claims involve both of these provisions.[1]

### i. Section 801(a)

Congress intended the lump sum retroactive payment and the one-time rent adjustment to restore owners to approximately the place they would have been had HUD calculated rent adjustments according to the AAF adjustment formula throughout the 1980's.[2] In section 801 Congress established a new formula for calculating AAF adjustments, which was used only for the purpose of making retroactive calculations to supplement the adjustments made in the 1980's. The section 801 calculation multiplies the AAF by the contract rent minus the portion of the rent attributable to debt service (the mortgage payment).[3] For example, if rent for a unit was $100, the AAF was 1.05, and the debt

service on the unit was $10, rent for the subsequent year would be $104.50.

$$(1.05) (\$100 - \$10) + \$10 = \$104.50 \text{ [4]}$$

Owners were eligible to receive the difference between the contract rent adjustments as calculated under the section 801 formula and the contract rent adjustments they actually received. Thus, if an owner should have received the $5 increase in rent shown in the section 8 sample calculation provided earlier, but had received only a $2 increase, the owner would be eligible to receive $2.50 as a lump sum retroactive payment.[5]

### ii. Section 801(d)

The one-time adjustment provided in § 801(d) incorporates the § 801(a) AAF adjustment formula described above. Section 801(d) provides that, upon request, the rent shall become the greater of the contract rent already approved for that year, or the contract rent as calculated by the § 801 AAF adjustment formula.

1. Section 801(a)(1) includes eligibility requirements designed to identify owners who did not receive adequate rent adjustments during the 1980's. HUD concedes that the plaintiffs meet those requirements.

2. Congress did not intend to entirely restore owners. Section 801 provided two alternative methods of making the lump sum calculation, neither of which were designed to fully compensate owners for inadequate rent adjustments in the 1980's.

3. In order to explain what might appear to be an inconsistency between the language describing the rent adjustment and the calculations expressing that adjustment, the Court notes that the rent adjustment calculations in both sections 8 and 801 provide a method for calculating the amount by which the rent should be adjusted, rather than the total figure of the rent. If the statutory language was directly translated into a mathematical equation, the examples provided in this section would appear as follows:

   Under section 8:    (.05) ($100) = $5
   Under section 801:  (.05) ($100 − $10) = $4.5

   The regulations, and the parties, alter the equations so that they result in a determination of the adjusted rent, rather than the rent adjustment, and the Court uses their method

of expressing the equations in the main body of the text.

4. As the example shows, the section 801 formula yields a smaller rent adjustment than the standard section 8 formula would have, based on the same AAF. The Court notes that in section 801(a) Congress included a second method of calculating the lump sum, although neither party suggests that HUD should have employed the alternative calculation in this case. The alternative method ensured that owners would receive a certain minimum level of adjustment. Owners would receive, at a minimum, 30 percent of the "aggregate of the annual adjustment factor multiplied by the full contract rent for each year on or after fiscal year 1980, minus the sum of the rental payments ... actually approved for those years." Owners qualified for the greater of the 30 percent baseline figure, or 100 percent of the difference between adjustments they actually received and adjustments calculated under the new formula established in § 801(a)(1).

5. This simplified example is based on the premise that the owner had received appropriate rent adjustments every other year between 1980 and 1991, and merited a retroactive payment only for the one year described in the example.

### iii. Implementing Subsections of Section 801

Congress authorized HUD to promulgate implementing regulations in § 801(e), and in 1991 HUD's regulations were codified at 24 C.F.R. § 888.301 et seq. ("1991 regulations"). The 1991 regulations required owners to request the lump sum retroactive payment and the one-time rent adjustment within 60 days of the mailing of an eligibility notice which would be sent to owners by HUD or the Contract Administrator (in Charlotte's case, CHA).

Congress provided that the lump sum payments were to be made during a three-year period to commence after implementing regulations were in place, and that the payments would be made "only to the extent approved in subsequent appropriations Acts." *See* § 801(b). The 1991 regulations provided that the request for lump sum payments and one-time rent adjustments would result only in an eligibility determination, and that a procedure for requesting actual payments would be published in the Federal Register once funds had been appropriated for the § 801 program. 24 C.F.R. § 888.310. On April 12, 1993, HUD published a Notice in the Federal Register establishing the procedures for claiming payment. The payments would be made on a first-come, first-served basis, as HUD anticipated that the amount of appropriations might be insufficient. The deadline for submission of payment vouchers was September 9, 1993. In May 1993, HUD sent out a memorandum to alert eligible owners of the April 12 Notice.

### B. *Plaintiffs' Actions Pursuant to Section 801*

In 1991 Clinton, Monroe, and Rocky Mount received notice from HUD and submitted timely requests for retroactive relief under § 801(a) and one-time rent adjustments under § 801(d). In 1992 HUD notified the three as to the amount they were eligible to receive in a lump sum, and notified them that they were not eligible for a one-time rent adjustment. Charlotte received notice from CHA, and submitted its application for relief to CHA. Like the other three housing developments, Charlotte was eligible for a lump sum payment, but not a rent adjustment. However, CHA failed to appropriately process Charlotte's request, and did not notify Charlotte as to its eligibility under either § 801(a) or (d). In 1994 HUD acknowledged Charlotte's eligibility and provided Charlotte with another opportunity to file a voucher as provided in the April 12 Notice, despite the fact that the deadline for voucher submissions had passed.[6]

The four plaintiffs were found to be eligible for the following amounts:

| | |
|---|---|
| Clinton | $21,023 |
| Monroe | $97,100 |
| Rocky Mount | $ 3,431 |
| Charlotte | $51,005 |
| Total | $172,559 |

In their complaint, plaintiffs allege that they submitted vouchers to HUD in accordance with the April 12 Notice, yet never received their lump sum payments. Defendants admit that HUD did not distribute the payments to the plaintiffs, but indicate that plaintiffs never filed the vouchers required by the April 12 Notice.

## II. ANALYSIS

Plaintiffs' claim as to the retroactive payment under § 801(a) is fact dependant, whereas their claim under § 801(d) turns exclusively on an issue of statutory interpretation.

### A. *Retroactive Payment Under § 801(a)*

In order to determine whether HUD's actions regarding the plaintiffs were rea-

---

**6.** Defendants assert that the proper defendant in the case brought by Charlotte is CHA, rather than HUD. However, in light of HUD's involvement in remedying CHA's failure to process Charlotte's request, and HUD's decision to allow Charlotte to submit a voucher for the retroactive payment for which Charlotte was eligible, the plaintiffs are in roughly the same position in relation to HUD. All four were found eligible for lump sum payments, and could have submitted vouchers to HUD in an effort to claim those payments.

sonable, the Court must first determine whether plaintiffs had complied with the April 12 Notice by filing vouchers.

### i. Vouchers

One of the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–34, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The court's role is not to engage in credibility determinations or to weigh the evidence, but to determine whether there is an issue to be tried. "[T]he evidence offered by the nonmoving party must be accepted as correct, and all justifiable inferences must be drawn in her favor." *See Goldman v. Bequai,* 19 F.3d 666, 672 (D.C.Cir.1994). However, to avoid summary judgment, the nonmoving party "must show the existence of evidence sufficient to permit a reasonable jury to find" in its favor. *Id.*

The moving party has the initial burden to inform the court of the basis for its motion and to identify evidence demonstrating the lack of a genuine issue of material fact. The burden then shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. *See, e.g., Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Greenberg v. Food and Drug Administration,* 803 F.2d 1213, 1215–16 (D.C.Cir.1986) (citing *Celotex* ). HUD has submitted ample evidence demonstrating that the plaintiffs did not file vouchers to claim their Section 801 retroactive payments. HUD has no record of receiving the vouchers, and the plaintiffs admit that "after a thorough review of their records, they have been unable to identify any documentation submitted on behalf of the Plaintiffs pursuant to those documents [the

April 12 Notice and May memorandum], and have not received any documents from HUD evidencing their receipt of those documents." *Plaintiff's Supplemental Responses to Defendants' First Set of Interrogatories* at p. 3. Defendants also came forward with affirmative evidence that the vouchers were never filed. HUD submitted a declaration in support of its motion for summary judgment by Shirley M. Elliott, who was employed by Godley Management since before Fred Godley, Jr., the current general managing partner, was managing the business, and remained an employee until 1996. She was "the only person whose primary focus was the four Section 8–subsidized properties," and she worked with another person in the office to assemble the paperwork necessary to apply for the Section 801 retroactive payment and one-time rent adjustment. Ms. Elliott reports preparing payment vouchers for all four properties, but declares that Mr. Godley instructed her not to file them because he did not believe the amounts were great enough, and thought that he could receive a greater amount by bringing a lawsuit against HUD. According to Ms. Elliott, when she left Godley Management in 1996 the vouchers had not been filed.

HUD clearly asserted its position that the vouchers had not been filed early on, and provided the plaintiffs with numerous opportunities to submit evidence to contradict HUD's position. In their complaint, plaintiffs allege that they "submitted the documentation required by the April 12 Notice and the May Memorandum to receive their retroactive payments". HUD's first interrogatory was a request that plaintiffs state the basis for that statement. Instead of affirmatively stating (or submitting evidence) that the vouchers were filed, in their first response plaintiffs stated that Mr. Godley submitted "those materials that, as he understood the process, were required to be filed." The response was not focused on the vouchers, as the interrogatory was. Instead, the re-

sponse relied on HUD's processing of their initial Section 801 applications as proof that the proper materials had been filed. In the last sentence of plaintiffs' response they turn to the issue of the vouchers, stating that "[t]o the extent that HUD asserts that the Plaintiffs' applications were incomplete, the Plaintiffs maintain they did not receive notice from HUD of the final components of the Section 801 process or a list of specific documents needed to complete the Plaintiffs' Section 801 applications."

In their second response, plaintiffs abandoned their attempt to blame their failure to submit the vouchers on a lack of notice, and made the vague and equivocal statement that "to the best of the recollection of their managing general partner, all necessary paperwork required by the referenced documents was submitted to HUD." As in their first response, the plaintiffs avoid making a specific and direct statement on the voucher issue, instead referring to "all necessary paperwork". The response does not specify the basis of Mr. Godley's recollection; it does not indicate that Mr. Godley filed the vouchers himself, or has personal knowledge that someone else filed them. In Mr. Godley's own declaration in support of plaintiffs' motion for summary judgment, he again evaded the issue of the vouchers, stating only that as to the filing of the vouchers, "I refer to the statement made in the Plaintiffs' Supplemental Response to Defendants' First Set of Interrogatories."

Not only do plaintiffs demonstrate a reluctance to affirmatively state that the vouchers were filed, they failed to avail themselves of the opportunity to depose Ms. Elliott. They did not attempt to impeach her, or provide specific evidence to contradict her statement. In *Bias v. Advantage Int'l, Inc.* 905 F.2d 1558 (D.C.Cir. 1990), the contested issue was whether the decedent had used illegal drugs in the past. Defendant provided specific evidence of the decedent's drug use through affidavits of people who had seen him use

drugs on specific occasions. The plaintiffs submitted affidavits of people who knew the decedent very well over a long period of time, who attested that he had not used drugs. Upholding the trial court's grant of summary judgment for the defendant, the court found that the generalized evidence could not overcome the defendant's specific evidence. Further, the court emphasized the plaintiffs' failure to make any effort to impeach the testimony of the defendant's witnesses, or to counter that evidence with specific evidence of their own. *Id.* at 1561–62; *see also Williams v. Kolb,* 145 F.2d 344 (D.C.Cir.1944) (general allegations are not sufficient to raise an issue of fact where the movant has supplied detailed and specific evidence). Here, plaintiffs have been confronted with the same type of specific evidence, including evidence that Mr. Godley made a conscious choice not to file the vouchers. Mr. Godley is the person in the best position to contradict that evidence, yet he has not denied that allegation, or definitively stated his personal knowledge that the vouchers were filed by Ms. Elliott or by anyone else.

In keeping with their decision not to support the allegation in their complaint that the vouchers were filed, plaintiffs now contend that the submission of the vouchers is not a material issue. In their opposition to HUD's motion for summary judgment plaintiffs do not devote much time to the issue, stating only that "while their managing partner believed, to the best of his recollection, that all paperwork required by HUD was submitted to HUD . . . they have been unable to locate any such documents." Similarly, in their own motion for summary judgment, plaintiffs merely state that "there appears to be a dispute among the parties concerning whether the Owners submitted vouchers" before moving on to assert that the dispute "is ultimately immaterial."

■ If the plaintiffs' evidence is "merely colorable, or is not significantly probative, summary judgment, may be granted."

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). HUD has presented specific evidence, and in order to avoid summary judgment the plaintiffs must "cast more than metaphysical doubt on the credibility of the testimony." In *Doe v. Gates*, 981 F.2d 1316 (D.C.Cir.1993), an employee of the Central Intelligence Agency (CIA) alleged that he had been fired as a result of a policy against homosexuals. The CIA provided evidence that Doe had been fired for a different reason, while Doe submitted an affidavit that two CIA officers had told him that his homosexual activities violated CIA regulations. The *Doe* court found that this "vague paragraph" in the plaintiff's affidavit was insufficient; direct and specific evidence was required to avoid summary judgment. The court emphasized that Doe had failed to submit further evidence despite having time and opportunity to do so. *See Id.* at 1323. In this case, the plaintiffs have failed to provide specific evidence despite having had the opportunity to do so. The plaintiffs have failed to submit more than "colorable" evidence in support of their initial claim that they did submit the required vouchers. The Court is well aware of the need to avoid making credibility judgments or weighing the evidence. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation and internal quotation omitted). The Supreme Court has made it clear that summary judgment is "an integral part of the Federal Rules," and should not be disfavored or avoided. In this case, there is insufficient evidence for a rational trier of fact to find that plaintiffs filed the vouchers.

ii. HUD's Obligations In Light of the Fact That Vouchers Were Not Filed

Plaintiffs argue that even if the vouchers were never filed, it was arbitrary and ca-pricious, and an abuse of discretion, for HUD not to waive its requirement that applicants for the Section 801 payment file vouchers. HUD counters that the APA does not provide a cause of action to force an agency to take a discretionary action such as waiving its own requirements. The Court finds it unnecessary to reach that issue, because HUD's failure to pay the plaintiffs was neither arbitrary and capricious nor an abuse of discretion.

This Court owes deference both to HUD's interpretation of the Section 801 statute as indicated in HUD's regulations, and to HUD's policy choice in designing the specific method by which claimants could collect their payments. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Environmental Defense Fund, Inc. v. Environmental Protection Agency*, 82 F.3d 451, 458 (D.C.Cir.1996) (even if plaintiffs offer plausible alternative interpretations of a statute, defer to the agency's interpretation if it is reasonable). The statute itself contemplated the need for regulations as well as the need to delay any distributions until appropriations had been approved. The statutory scheme thus created a need for two mechanisms, one through which eligibility determinations would be made, and one through which actual payments could be disbursed. HUD's 1991 implementing regulations established the first mechanism, and alerted potential applicants that HUD would publish a notice in the Federal Register to explain the second mechanism. The April 12 Notice established the second mechanism, allowing owners to claim payments by submitting vouchers which certified that the owner was entitled to the payment.

█ HUD's requirements were reasonable, ample time was provided for compli-

ance with the required procedures, and notice was provided to applicants, including the plaintiffs. Plaintiffs do not claim that they lacked notice, that they were unable to comply with the voucher procedure, or that they lacked sufficient time to file the vouchers. Notice of the need to file vouchers was provided by the publication of the April 12 Notice in the Federal Register, and by the memorandum HUD sent to eligible owners in May 1993. Ample time was provided for compliance; the April 12 Notice established an initial period of about five months, and that deadline was extended until August 31, 1995. *See* HUD Notices 93–57 and 94–57.

It is not an abuse of discretion to require that a voucher be filed in order to receive a payment. *See, e.g., JEM Broadcasting Co. v. Federal Communications Comm'n,* 22 F.3d 320 (D.C.Cir.1994) (agency has authority to establish cut-off dates after which applications will not be considered); *Foss v. Nat'l Marine Fisheries Serv.,* 161 F.3d 584 (9th Cir.1998) (establishing a 180–day application period was not arbitrary and capricious, therefore agency's rejection of an application received 45 days late was reasonable). The procedures established in the 1991 regulations and the April 12 Notice were reasonable, therefore it is proper for HUD to require compliance with those procedures. Plaintiffs did not comply, and lost their opportunity to claim the $172,559 that HUD initially found them eligible to receive.

### B. One-time Rent Adjustment Under § 801(d)

Both parties acknowledge that there is no factual dispute concerning the claim for a one-time rent adjustment. Plaintiffs timely filed an application for a one-time rent adjustment in accordance with the 1991 regulations, and HUD denied their request. The plaintiffs do not allege that HUD applied the formula for calculating the one-time adjustment incorrectly in their case; rather, they allege that HUD's

regulations establishing its formula are unsupported by the statute. Again, the Court will defer to HUD's interpretation of the statute so long as that interpretation is reasonable.

The dispute between the parties involves the interpretation of one term of the formula Congress established. As described earlier, Section 801(d) provides that an owner's contract rent shall, upon request, be adjusted to the higher of the contract rent:

(A) currently approved by the Secretary under section 8(c)(2) of the United States Housing Act of 1937, or

(B) calculated in accordance with the first sentence of subsection (a)(1).

The calculation in Section 801(a)(1) is as follows:

"for fiscal year 1980, and annually thereafter until regulations implementing this section take effect, rental adjustments shall be calculated as an amount equal to the annual adjustment factor multiplied by a figure equal to the contract rent minus the amount of contract rent attributable to debt service."

Both parties agree that the formula, mathematically expressed, is:

AAF(contract rent − debt service) + debt service.

Their dispute lies in the definition of "contract rent". Congress did not specify whether the term referred to the actual approved "contract rent" from the preceding year, to what the preceding year's contract rent would have been if it had been correctly calculated under Section 8 of the Housing Act, or to the preceding year's contract rent as it was calculated under the Section 801(a)(1) formula. The Court finds that the statute is ambiguous, and will therefore accept HUD's interpretation of the term "contract rent" so long as it is reasonable. *See Chevron,* 467 U.S. at 845, 104 S.Ct. 2778.

Although Congress did not define the term "contract rent," the context provided by the statute as a whole offers guidance.

The meaning of the term should be consistent for the purposes of both Section 801(a)(1) and 801(d). In calculating the retroactive payment owed to the plaintiffs under 801(a)(1), HUD defined "contract rent" as the rent for the preceding year as calculated under 801(a)(1). In other words, HUD calculated an adjusted rent for 1980 based on the actual contract rent from 1979, then used the adjusted 1980 rent as "contract rent" for its 1981 calculation, and continued the pattern, using adjusted rents as "contract rent," up through 1991. This was in keeping with Congress' intent to approximate the rent adjustments that should have been made, and to compensate owners for the difference between the adjustments they did receive and the adjustments they would have received if the proper AAF calculations were made. The plaintiffs do not contest HUD's interpretation of the term "contract rent" for their retroactive payments under Section 801(a).

■ Plaintiffs propose that in the 801(d) calculation, "contract rent" means the actual approved contract rent from the year preceding the adjustment year. If the term was given that meaning for the purposes of both 801(d) and 801(a), owners who had faced the most severe rent shortfalls in the 1980's would not be sufficiently compensated. For example, if an owner had received no increases in contract rent throughout the 1980's, the same low contract rent figure would be used in each year's retroactive calculation under 801(a), and for the 801(d) calculation as well. In contrast, using HUD's definition the owner's contract rent would increase each year, yielding a much larger adjustment under both 801(a) and 801(d). HUD's interpretation is eminently reasonable for use in both 801(a) and 801(d) calculations.

## III. CONCLUSION

The 1993 Notice requiring owners to submit vouchers to claim payments was consistent with both the statute and HUD's own regulations, and HUD was under no obligation to issue payment to the plaintiffs when they failed to comply with that Notice. The formula HUD employed to calculate the one-time rent adjustment under Section 801(d) was a reasonable interpretation of the statute.[7] It is therefore

**ORDERED** that HUD's motion for summary judgment is granted; and it is

**FURTHER ORDERED** that the plaintiffs' motion for summary judgment is denied.

IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the Memorandum Opinion and Order issued this date and Fed.R.Civ.P. 58, judgment is hereby entered in favor of defendants Andrew Cuomo and the United States Department of Housing and Urban Development, and against plaintiffs Charlotte Housing for the Elderly, Clinton Housing for the Elderly, Monroe Housing for the Elderly, and Rocky Mount Housing for the Elderly.

IT IS SO ORDERED.

---

7. Plaintiffs complaint also contains counts based on mandamus, the plaintiffs' contracts with HUD, and their interpretation of Section 801 as a money mandating statute. All of the claims rely on the premise that HUD should have paid plaintiffs a retroactive lump-sum compensation, and should have awarded them a one-time rent adjustment. Having rejected that premise, there is no need to separately discuss the arguments in each of plaintiffs' claims.