HADDON HOUSING ASSOCIATES, LLC, and The Housing Authority of the Township of Haddon, New Jersey, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 07–646C.

United States Court of Federal Claims.

June 24, 2011.

Fred J. Livingstone, Taft Stettinius & Hollister LLP, Cleveland, Ohio for plaintiff. With him at trial and on the briefs was Majeed G. Makhlouf, and with him on the briefs was Mark J. Valponi, both of whom are with Taft Stettinius & Hollister LLP, Cleveland, Ohio.

Armando A. Rodriguez–Feo, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. With him at the trial and on the briefs was Amber Richer, Office of General Counsel, Department of Housing and Urban Development, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This post-trial decision addresses liability for an alleged breach of a rent-assistance contract. Rohrer Towers II Apartments ("Rohrer Towers II") is a rental housing facility for elderly residents located in Haddon Township, Camden County, New Jersey. Plaintiff Haddon Housing Associates, Ltd.

("Haddon Associates"), the owner of Rohrer Towers II, leased the property to plaintiff Housing Authority of the Township of Haddon, New Jersey ("Housing Authority"). Housing Authority in turn entered into a housing assistance payments contract ("HAP Contract" or "Contract") with the United States Department of Housing and Urban Development ("HUD") to provide low-income housing under an amendment enacted in 1974 to the Housing Act of 1937 (also known as the Wagner–Steagall Housing Act). *See* Housing and Community Development Act of 1974, Pub.L. No. 93–383, 88 Stat. 633, 662–66 (1974) (adding Section 8 to the Housing Act of 1937, codified as amended at 42 U.S.C. § 1437f).

Plaintiffs contend that a 1994 amendment to the Housing Act, which altered, among other things, the manner in which rent adjustments under HAP contracts were to be determined, contravened its HAP Contract with HUD. Specifically, plaintiffs allege that HUD breached the HAP Contract when it failed to grant annual rent adjustments to plaintiffs as required by the terms of the Contract. The government resists liability and also raises procedural objections. It argues that Haddon Associates is not a proper plaintiff in this case because it was not initially a party to the HAP Contract, even though it is now party to that contract by way of an assignment in which HUD joined. It contends also that Housing Authority's claim must fail because the contract at issue required Housing Authority to request annual rent increases, and plaintiffs consequently lack any "entitlement" to adjustments under the contract. Alternatively, the government asserts that even if the HAP Contract was breached, plaintiffs' failure to request a rent adjustment for the years 2001 through 2003 precludes them from recovering damages for those years. At issue as well are other provisions of the 1994 Amendments, which provisions serve to limit or otherwise reduce the rental assistance payments property owners may receive under HAP contracts. Plaintiffs filed their complaint on September 4, 2007; thus, the period covered by their

claim reaches back to September 4, 2001.[1]

Previously, this court considered and denied a motion for summary judgment by plaintiffs and a cross-motion for summary judgment by the government. *See Haddon Housing Assocs., LLC v. United States*, 92 Fed.Cl. 8, 20 (2010). In ruling that material issues of fact precluded summary disposition, the court pointed to evidence suggesting that Haddon Associates was potentially a proper plaintiff notwithstanding its absence from the HAP Contract as originally entered between Housing Authority and HUD. In addition, from the materials then at hand, it appeared that plaintiffs had requested some rent adjustments, and that the parties had substantially differing accounts as to the course of performance under the Contract. *See id.* at 19.[2]

Thereafter, a three-day trial on liability was held from November 15 to 17, 2010 in Philadelphia, Pennsylvania. Post-trial briefing has been completed, and on April 29, 2011, the parties presented their respective closing arguments. The case is accordingly ready for disposition.

### FACTS[3]

#### A. *The Section 8 Housing Program*

Pursuant to Section 8 of the Housing Act of 1937 ("the Housing Act"), HUD may enter into HAP contracts with private property owners. HAP contracts establish an agreed "maximum monthly rent" the property owners will require from tenants, as supplemented by HUD's supply of "assistance payments" to the owners. *See* 42 U.S.C. § 1437f (1976). Under the Act, the "maximum monthly rent" was to be based upon the "fair market rental" value of the dwelling unit plus an upward adjustment, determined by the application of that year's "automatic annual adjustment factor" ("AAAF"), to compensate for the expenses attendant to compliance with the Section 8 program. *See* 42 U.S.C. § 1437f(c)(1), (2)(A) (1976). HUD was required by statute to adjust the maximum monthly rents on at least an annual basis. *See* 42 U.S.C. § 1437f(c)(2)(A) (1976). Such adjustments, however, were subject to an overall limitation, which dictated that "[a]djustments in the maximum rents ... shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(C) (1976) (which text appears in similar form in the initial sentence of Section 1437f(c)(2)(C) as amended).

Beginning in the 1980s, HUD began conducting "comparability studies" to enforce the overall limitation in markets in which it believed automatic annual adjustments were generating rent levels that were materially higher than those for comparable, unassisted units. *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 14, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). After landlords successfully contested HUD's action in a court of appeals, *see Rainier View Assocs. v. United States*, 848 F.2d 988 (9th Cir.1988), Congress amended the Housing Act in 1987 by adding the following sentence to Section 1437f(c)(2)(B): "If the Secretary ... does not complete and submit to the project owner a comparability study not later than 60 days before the anni-

---

**1.** Plaintiffs have since filed jointly an action in this court for rent adjustments covering the years 2008 through 2010, plus the year 2007 from September 4, 2007 onwards. *See* Complaint at 5–6, *Haddon Housing Assocs., LLC v. United States*, No. 11–167C (Fed.Cl. filed Mar. 18, 2011), ECF No. 1.

**2.** In its earliest procedural stages, this case was consolidated with another action, *Pennsauken Senior Towers Urban Renewal Assocs., LLC v. United States*, No. 07–174C (Fed.Cl. filed Mar. 15, 2007), which also concerned a HAP contract with HUD. Following a decision denying a motion for partial dismissal by the government on statute-of-limitations grounds, *see Pennsauken*

*Senior Towers Urban Renewal Assocs., LLC v. United States*, 83 Fed.Cl. 623, 629 (2008), the parties to the *Pennsauken* action reached a settlement, *see* Stipulation for Entry of Judgment, *Pennsauken*, No. 07–174C (Dec. 17, 2008), but agreement could not be reached to resolve the *Haddon* action. At that juncture, *Haddon* was severed, and judgment was entered in *Pennsauken* based upon the settlement.

**3.** The recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set out in the analysis.

versary date of the assistance contract . . ., the [AAAF] shall be applied." Housing and Community Development Act of 1987, Pub.L. No. 100–242, § 142(c)(2)(B), 101 Stat. 1815, 1850 (1988).

In 1989, Congress further modified the administration of HAP contracts by enacting Section 801 of the Department of Housing and Urban Development Reform Act of 1989, Pub.L. No. 101–235, 103 Stat.1987, 2057–59 (codified at 42 U.S.C. § 1437f(c)(2)(C) (Supp. II 1991) and 42 U.S.C. § 1437f note (Supp. II 1991)) ("1989 Amendments"), which prescribed new procedures for calculating rent adjustments. In relevant part, the 1989 Amendments required HUD to formulate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in . . . *material* differences" and to establish modified AAAFs on that basis. Section 801(c), 103 Stat. at 2058 (emphasis added). The Supreme Court subsequently upheld Section 801, concluding that the 1989 Amendments did not constitute a breach of the HAP contracts because the contracts authorized HUD to generate such studies and use them in its administration of rent adjustments. *Cisneros,* 508 U.S. at 21, 113 S.Ct. 1898.

In 1994, Congress once more revised the statutory framework and shifted to owners the burden of proving that the adjusted rent for their units would not exceed the rent for a comparable, unassisted unit. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub.L. No. 103–327, 108 Stat. 2298, 2315 (1994) (amending 42 U.S.C. § 1437f(c)(2)(A)) ("1994 Amendments"). In this vein, the Amendments dictated that if application of the AAAF to the monthly rent would "exceed[ ] the *fair market rental* for an existing dwell-

ing unit in the market area, the Secretary shall adjust the rent only to the extent that *the owner demonstrates* that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." 108 Stat. at 2315 (emphasis added). The Amendments also reduced by one percent the AAAF for units occupied by a tenant who was remaining in a unit he or she had occupied in the previous year ("non-turnover units"). *Id.*

HUD thereafter issued guidance on the 1994 Amendments in the form of Notice 95–12.[4] *See* JX 41 at 1 (HUD Directive 95–12, Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995 (Mar. 7, 1995)).[5] The Notice stated:

> If current project rents on a . . . contract (before application of the [A]AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date [a rent comparability study].

*Id.* at 2–3. The Notice provided as well that if the owner failed to submit the study at least 60 days prior to the contract anniversary date, the rent levels would not be adjusted on the anniversary date, but rather the new rent levels would go into effect 60 days after receipt of the required information. If the owner failed to submit the study within the contract anniversary year, however, then no increase would be granted for that year. *Id.* at 3. If the owner demonstrated that comparable, unassisted units were more than five percent over the current contract rent, HUD would increase the rent to the lesser of: (1) the rent level adjusted by the AAAF or (2) the comparable, unassisted rent plus the initial difference (the amount by which the original contract rent exceeded the original com-

---

**4.** Although both the Amendments and the Notice were only effective for certain contract years, both have been extended numerous times such that they cover the time period at issue in this case. *See Park Props. Assocs., L.P. v. United States,* 82 Fed.Cl. 162, 166–67 (2008) ("*Park Properties II* "). The 1994 Amendments, HUD Notice 95–12, and successive notices, took effect with respect to the Rohrer Towers II Apartments

Contract on March 17, 1995. Joint Stipulations of Fact for Trial ("Stip.") ¶ 9.

**5.** Joint Exhibits are cited as "JX___." Citations to the transcript of the trial are to "Tr.___." Citations to the transcript of the closing argument are to "Cl. Tr.___." The Joint Stipulations of Fact for Trial (Oct. 27, 2010) are designated as "Stip. ¶ ___."

parable rent). *Id.* at 3–4. If implementing the new effective rent would require a rent reduction, the current rent level remained in place. *Id.* at 4.[6]

### B. *The Contract Applicable to Rohrer Towers II*

On January 1, 1980, Haddon Associates leased the Rohrer Towers II property to Housing Authority for a 30–year term. Stip. ¶ 4. The terms of the lease addressed Housing Authority's participation in the Section 8 program, and provided that "[Housing Authority] has heretofore entered into an Agreement to Enter Into [a] Housing Assistance Payments Contract ('HAP Agreement') with the United States of America acting through [HUD] pursuant to the provisions and requirements of Section 8 of the United States Housing Act of 1937, as amended and supplemented." JX 74 at 1 (Lease Agreement (Jan. 1, 1980)). Pursuant to Section 7.01 of the lease, "[Housing Authority] covenant[ed] to comply with the terms and provisions of the HAP Agreement and the HAP Contract." *Id.* at 15.[7]

Housing Authority entered into an Agreement to Enter into a Housing Assistance Payment Contract ("AHAP") with the United States effective January 21, 1980. Stip. ¶ 3.[8] Attached to the AHAP was a copy of a so-called "old-form HAP" contract, which contract form was in effect and used by HUD prior to August 1980. *See* JX 2 at 20–26 (AHAP and attached old-form HAP); *see also* Tr. 403:21 to 405:1 (Arce). Section

1.8(b) of the old-form HAP contract provided, in pertinent part, that "[o]n each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the [g]overnment." JX 2 at 14 (emphasis added).

Pursuant to revised regulations governing HAP contracts effective October 15, 1979, HUD adopted a new-form HAP contract in August 1980. *See* Tr. 404:24 to 405:1 (Arce).[9] Housing Authority entered into the HAP Contract with HUD for the Rohrer Towers II Apartments Project, project number NJ16–0029–003, effective March 17, 1981. Stip. ¶ 3. Consequently, the parties' agreement reflected the new-form HAP contract. *See* JX 3 (HAP Contract).

As with the old-form HAP contract, the new form incorporated the "overall limitation" contained within Section 8 of the Housing Act, and dictated that "[n]othwithstanding any other provisions of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD." JX 3 at 16 (§ 2.7(d)). However, the new-form HAP contract differed in a significant respect from the old-form HAP. Regarding rent adjustments, the plaintiffs' contract provided that "*upon request from the Owner to the C[ontract] A[dministrator],* Contract Rents will be adjusted on the anniversary date of the

---

6. As described subsequently, *see infra*, at 10 n. 18, only if a HAP contract were to be renewed pursuant to the Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub.L. No. 105–65, Title V, 111 Stat. 1344, 1384–1424 ("MAHRA"), could the contract rent be reduced on the basis of a rent comparability study.

7. The lease further provided that "[o]n or before the tenth day of each month during the term of the HAP Contract and any renewals thereof, [Housing Authority] or the Management Agent on [Housing Authority's] behalf shall submit to HUD monthly requests for the payment of Housing Assistance Payments for the next succeeding month with respect to the Project together with a specific direction to HUD that such payments shall be made to the Trustee [appointed under an indenture agreement]." J. Ex. 74 at 10–11. In turn, the Trustee was obligated to credit the

deposits "to [Haddon Associates] against its obligations under the Note and Mortgage . . . or [the deposits] [would] otherwise be expended on behalf of [Haddon Associates]." *Id.* at 11.

8. An AHAP is "an agreement between HUD and the owner that once they build the project or they substantially rehabilitate the project, [HUD] will enter into a housing assistance payments contract with them." Tr. 403:15–20 (Test. of Ms. Theresa Arce, Supervisory Project Manager, HUD).

9. The pertinent provision of the 1979 regulations, entitled "Automatic Annual Adjustment of Contract Rents," provided that "[u]pon request from the owner to the contract administrator, contract rents will be adjusted on the anniversary date of the contract in accordance with 24 C.F.R. Part 888." 24 C.F.R. § 880.609(a) (1980).

Contract in accordance with 24 C.F.R. [Part] 888 and this Contract." *Id.* (§ 2.7(b)(1)) (emphasis added).

### C. *The Management of Rohrer Towers II*

Haddon Associates and Housing Authority memorialized their relationship regarding Rohrer Towers II in a management agreement entered by them on January 1, 1980. *See* JX 1 at 4 to 39 (Management Agreement (Jan. 1, 1980)). In pertinent part, it provided that Haddon Associates was to "[r]eview monthly progress reports, budgets, and statements," "[a]ccept financial responsibility for the [p]roject," and "[a]ppoint a management agent to perform the day-to-day management operations of [Rohrer Towers II]." *Id.* at 12. The agreement dictated in effect that Haddon Associates would appoint Housing Authority as such agent, requiring Haddon Associates to "utilize [Housing Authority] for the day-to-day operation of [Rohrer Towers II]," and to "oversee both physical maintenance and financial administration of the development and advise [Haddon Associates] on a frequent, regular basis through written reports, financial statements, and oral communications, as to the status of the project and its residents." *Id.* at 12. Housing Authority had "complete authority and responsibility" for "[o]perating the property for the good of the residents and [Haddon Associates]," "[c]onforming to all federal and local agency regulations, in particular maintaining [Rohrer Towers II]," and "[f]iling all reports required by federal and local agencies and [Haddon Associates]." *Id.* at 14.

Housing Authority assigned its management responsibilities under the agreement to PRD Management in 1980, prior to the completion of the project. Tr. 69:15-17 (Test. of Mr. Henry C. Steenland, Majority and Man-aging Partner of Haddon Associates and Owner of Grand Suites Management). After Housing Authority made the initial assignment, Mr. Steenland supervised the activities of PRD Management. Tr. 72:6-9 (Steenland). PRD continued in this supervisory role until 1992, at which time Mr. Steenland selected his own company, Grand Suites Management, to take over the managerial duties for Rohrer Towers II. *See* Tr. 69:20-22; 71:1-2 (Steenland).[10] As a result of these assignments of managerial duties, in reality Housing Authority played "no role" "in the day-to-day management of Rohrer Towers II." Tr. 70:2-4 (Steenland).

As assignees of the managerial powers of Housing Authority, PRD and Grand Suites Management were purportedly responsible for the day-to-day operations of Rohrer Towers II during their respective tenure as the managing company. *See* Stip. ¶ 25; Tr. 352:10-12 (Test. of Scott Schaeffer, Former Controller, PRD Management). Yet, in reality Haddon Associates itself maintained operational and managerial responsibility over Rohrer Towers II at all times. *See* Tr. 69:22-23 (Steenland) ("Haddon Hous[ing] Associates always ... manage[d] it, operate[d] it.").[11] In this regard, Mr. Steenland testified that Haddon Associates "was responsible for the property and expenses" respecting Rohrer Towers II, "was entitled to the operating income" from Rohrer Towers II, and accordingly "paid the taxes on the HAP rental income." Tr. 66:6-11, 66:17-19 (Steenland). Additionally, the salaries of the employees of Rohrer Towers II, all of whom reported to Mr. Steenland, were paid by Haddon Associates. *See* Tr. 71:7-11 (Steenland). To this end, operational funds for Rohrer Towers II were deposited into Haddon Associates' bank accounts and operation-

10. Neither Haddon Associates nor Housing Authority possesses any legal interest in Grand Suites Management. Stip. ¶ 23.

11. Persons working for several entities controlled by Mr. Steenland initiated rent requests for those years in which requests were indeed made. While the parties stipulate that Grand Suites Management submitted requests during its tenure, Stip. ¶¶ 26, 28-31, the requests themselves reveal that for some years they were made by individuals not employed by Grand Suites Management. Some requests were generated by Mr. Neil Neri, *see* JX 5 at 1 (Rent adjustment request for 1990); JX 6 at 1 (Rent adjustment request for 1991), who was a Controller for Franland Construction Company, a company owned by Mr. Steenland, Tr. 75:18-22 (Steenland), while the requests for rent adjustments during 2004 through 2006 were made by Ms. Kathleen Simpkins, Administrator for Rohrer Towers II from 1995 to the present, JX 15 at 1 (Rent adjustment request for 2004); JX 16 at 1 (Rent adjustment request for 2005); JX 17 at 1 (Rent adjustment request for 2006).

al expenses were paid out of those same accounts. *See* Tr. 71:12–18 (Steenland); *see also* Tr. 210:5–9 (Test. of Ms. Simpkins, Administrator of Rohrer Towers II from 1995 to present).

The parties' relationship to Rohrer Towers II was altered formally by a tripartite Assignment Agreement, into which Haddon Associates, Housing Authority, and the United States, acting through HUD, entered on December 29, 2008. *See* JX 20 at 1–4 ("Assignment, Assumption and Amendment Agreement"). The Assignment Agreement provided that Housing Authority "irrevocably assign[ed] [the] HAP Contract to [Haddon Associates] together with all rights and obligations in and under said contract." *Id.* at 2. The Agreement provided also that "the Contract Administrator [HUD] and [Haddon Associates] mutually desire[d] to[ ] amend the HAP Contract to allow for physical inspections in accordance with 24 CFR Subpart G and require financial reporting in accordance with 24 CFR Subpart H." *Id.* To that end, the Assignment Agreement provided that as of December 29, 2008, Haddon Associates "agree[d] to assume and to be bound by [the] HAP Contract" and Housing Authority "[wa]s released from any further liability under the HAP Agreement." *Id.* The contract was also amended to reflect the new regulatory provisions. *Id.* The Secretary of HUD, through its representative Walter Kreeber, Director, Newark Multifamily Program Center, "consent[ed] to the assignment" and signed the Agreement. *Id.* at 3–4.

### D. *Rent Adjustments for Rohrer Towers II*

At the time of the execution of the Rohrer Towers II HAP Contract in 1981, the month-

ly contract rent was $493 for each one-bedroom apartment unit and the initial difference was $74. Stip. ¶ 7.[12] By 1995, the contract rent approved by HUD had increased to $860. *Haddon*, 92 Fed.Cl. at 13. The rent remained at that level until an adjustment was approved for anniversary year 2007, which adjustment brought the contract rent to $889 per unit. *Id.* During the twelve-year period, from 1995 to 2007, in which Haddon did not receive a rent increase, it nonetheless regularly submitted to HUD vouchers for payments and received monthly housing assistance payments at the constantly maintained level. *Id.*

From 1982 through 1987, rental adjustments were provided. *See* Tr. 72:20 to 73:9 (Steenland); *see also* JX 71 (HUD letter confirming rent adjustment for 1982); JX 4 (HUD letter confirming rent adjustment for 1987).[13] For the years 1988 and 1989, rent adjustments were not provided. *See* Stip. ¶ 22; Tr. 73:9 to 75:8 (Steenland). The evidence is conflicting, however, as to whether the adjustments or denials during this period were initiated automatically by HUD or were a product of a request by plaintiffs. This uncertainty is due largely to the absence of any pertinent records. *See* Tr. 212:3–20 (Simpkins); Tr. 359:25 to 360:15 (Schaeffer).[14] In the context of this documentary vacuum, the parties rely heavily on the testimony adduced at trial to establish the course of performance during this period.

In support of its contention that rent requests were not required of or made by Rohrer Towers II from 1982 through 1989, plaintiffs point to the testimony of Mr. Scott Schaeffer, Controller for PRD Management.

---

**12.** All of the apartments in Rohrer Towers II are one-bedroom units, designed to be occupied by elderly residents. A site visit to Rohrer Towers II disclosed that the common areas and apartments are well-constructed and maintained in exemplary fashion, located in a pleasant locale with nearby shopping areas and convenient transportation, and provided with adequate, well-lighted parking. Perhaps understandably in the circumstances, the facility has a substantial waiting list of applicants for apartments.

**13.** Although direct evidence proving that annual adjustments occurred for the years 1983 through 1986 is lacking, the significant differential be-

tween the approved rent in 1982 ($549), *see* JX 71, and the approved rent in 1987 ($705), *see* JX 4, suggests that adjustments were indeed made in the intervening years.

**14.** Ms. Simpkins stated that an exhaustive search of documents regarding rent adjustments for Rohrer Towers II during this period revealed two rent requests for 1990 and 1991, a letter dated 1987 from HUD confirming a rent increase, and "some correspondence from 1988 and 1989 regarding a special rent adjustment." *See* Tr. 212:3–20.

Mr. Schaeffer stated that from 1982 until the early 1990s, no requests for rent adjustments were initiated by anyone at PRD; rather, the adjustments were given automatically, with notification provided by way of a letter from HUD stating the new contract rent figures. *See* Tr. 354:3 to 355:17. Mr. Steenland testified in this regard as well, maintaining that although he was not involved personally in the process of rent adjustments, his understanding is that such adjustments were automatic during this period. *See* Tr. 72:20 to 73:5.

The government elicited contrary testimony from Ms. Theresa Arce, an employee of HUD who has held various managerial roles culminating in her current position as Supervisory Project Manager for HUD's Newark Multifamily Program Center. *See* Tr. 365:5–22 (Arce). Ms. Arce stated that for new-form HAP contracts, it was and is HUD policy to require the owner to submit a request for an annual rent adjustment. *See* Tr. 413:3–5; 413:12–17; 415:8–11. Ms. Arce could not testify as to whether that policy was actually applied to Rohrer Towers II. *See* Tr. 414:7–15. The conflict in the testimony over the course of performance for the years 1982 through 1989 need not be resolved.

The circumstances of the rent adjustments in the seventeen years leading up to plaintiffs' filing of a complaint in this court, *i.e.*, from 1990 onwards, can be confidently ascertained. From 1990 through 1998, plaintiffs submitted requests for adjustments to the contract rent. Stip. ¶¶ 22, 26; *see* JX 5 at 1 (Rent adjustment request for 1990); JX 6 at 1 (Rent adjustment request for 1991); JX 7 at 1 (Rent adjustment request for 1992); JX 8 at 1 (Rent adjustment request for 1993); JX 9 at 1 (Rent adjustment request for 1994); JX 10 at 1 (Rent adjustment request for

1995); JX 11 at 1 (Rent adjustment request for 1996); JX 12 at 1 (Rent adjustment request for 1997); JX 13 at 1 (Rent adjustment request for 1998). From 1990 through 1995, such requests were granted. *See* Stip. ¶ 22. During the years 1996 through 1998, however, rent adjustments were denied because the requests did not include a rent comparability study as mandated by the 1994 Amendments and HUD Notice 95–12. *See* Stip. ¶ 26; JX 11 at 3 (Letter from HUD denying rent adjustment for 1996); JX 12 at 2 (Letter from HUD denying rent adjustment for 1997); JX 13 at 2 (Letter from HUD denying rent adjustment for 1998); *see also* Tr. 375:23–25 (Arce) ("[I]t was simply the failure to submit the comparability study that ended the process without going further.").[15]

Beginning in 1999 and through 2003, no rent requests were submitted to HUD for Rohrer Towers II. Tr. 234:14–17 (Simpkins). Ms. Simpkins, the Administrator of Rohrer Towers II, testified that she elected to forego the request process for those years because "[a]fter asking for requests for three years and being denied for three years, I stopped asking. I didn't feel as though if I sent a letter every day they would [grant an adjustment]—[rather believed I] would receive the same response." Tr. 234:9–13.[16]

In 2002, Grand Suites Management hired Axiom Corporation to conduct a rent comparability study for Rohrer Towers II. *See* Stip. ¶ 28; Tr. 239:4–9 (Simpkins). That study found that the estimated market rent was below that rent which Rohrer Towers II was then receiving. Tr. 239:10–11 (Simpkins). Given that development, Ms. Simpkins contacted Mr. Gregory Collins, a subsidy accountant at the New Jersey Housing and Mortgage Finance Agency ("NJHMFA"),[17] and asked him whether a property owner who submitted to HUD a comparability

---

**15.** Prior to 1996, rent increases had been granted without the inclusion of a comparability study. *See* Tr. 77:16–21, 80:2–10 (Steenland), Tr. 127:23 to 128:5 (Test. of Mr. Richard Hawk, Administrator of Rohrer Towers II from 1992 through early 1995).

**16.** Contrastingly, in 2002, Ms. Simpkins initiated a request for a special utility increase from HUD and that request was granted in 2003. *See* Tr. 234:20–25, 239:2–5 (Simpkins).

**17.** Effective December 2000, NJHMFA became HUD's performance-based contract administrator for the Rohrer Towers II HAP Contract. Stip. ¶ 27. NJHMFA replaced Rohrer Tower II's contract administrator at HUD, and received all inquiries, statements, and rental requests, and in turn distributed to Rohrer Towers II its subsidy payments pursuant to the contract. *See* Tr. 243:8 to 244:3, 246:12 to 247:6, 247:18–24 (Simpkins).

study with an estimated market rent below the current rent would face a potential reduction in the contract rent. Tr. 240:2–6; 263:4–8 (Simpkins). Mr. Collins advised Ms. Simpkins that the contract rent could be reduced and the property owner could elect instead to forego submission of the rent request for that year. *See* JX 24 (Mem. by Ms. Simpkins recounting conversation with Mr. Collins (Feb. 2002)); Tr. 306:6 to 307:5, 321:5–22 (Test. of Mr. Gregory Collins). Based upon the information provided by Mr. Collins, Mr. Steenland and Ms. Simpkins elected to forego submitting the request for that year. Tr. 256:24 to 257:2 (Simpkins). Ms. Simpkins and Mr. Steenland later discovered in a meeting with HUD officials that Mr. Collins' advice was in fact erroneous and that rent could not be decreased for Rohrer Towers II on the basis of a rent comparability study at that time. *See* Tr. 263:8–13 (Simpkins).[18]

During the years 2004 through 2006, Ms. Simpkins once again submitted requests for rent adjustments. Stip. ¶ 29; *see* JX 15 at 1 (Rent adjustment request for 2004); JX 16 at 1 (Rent adjustment request for 2005); JX 17 at 1(Rent adjustment request for 2006).[19] Included with each of these submissions was the additional request that Rohrer Towers II be granted retroactive rent adjustments calculated from 1996 to the year of each request. *See* JX 15 at 1; JX 16 at 1; JX 17 at 1. The requests did not include rent comparability studies, and, as a consequence, rent adjustments were not granted to Rohrer Towers II during those years. *See* Stip. ¶ 29; JX 15 at 3 (Denial of rent adjustment request for 2004); JX 16 at 2 (Denial of rent adjustment request for 2005); Tr. 268:7–11, 270:6–20 (Simpkins).

In 2007, Ms. Simpkins submitted a rent adjustment request for contract year 2007, which request included a rent comparability study. Stip. ¶ 30; *see* JX 18 at 1, 3–5 (Rent adjustment request for 2007 and rent comparability study). Included in that submission was a request that Rohrer Towers II be granted retroactive rent adjustments calculated from 1996 through the year 2007. JX 18 at 1. A rent adjustment was ultimately granted for the 2007 year only. JX 18 at 8.

On August 13, 2007, after the filing of plaintiffs' complaint, plaintiffs' counsel requested that HUD retroactively adjust contract rents dating back to 2001. Stip. ¶ 32; *See* JX 18A at 1–2. This request, which included as attachments rent comparability studies for the years 2001 through 2007, JX 18A at 12–18, was denied. *See* Pls.' Post–Trial Br. at 5. In 2008, 2009, and 2010, Grand Suites Management submitted requests for annual adjustments that included rent comparability studies for those years. Stip. ¶ 31.

## ANALYSIS

### I. *JURISDICTION OVER HADDON ASSOCIATES' CLAIM*

The government challenges Haddon Associates' joinder as a plaintiff on the ground that it was not a signatory to the HAP Contract executed in 1980 between Housing Authority and HUD. *See* Def.'s Post–Trial Br. at 32. The government, however, ignores the operative effect of the Assignment Agreement between Housing Authority, Haddon Associates, and HUD.

#### A. *The Assignment Agreement*

As noted, on December 29, 2008, Housing Authority, Haddon Associates, and HUD entered into an "Assignment, Assumption and Amendment Agreement [to the] Section 8 Housing Assistance Payments Contract." JX 20 at 1. The agreement recounted the

---

**18.** Ms. Arce testified that contract rent could be reduced on the basis of a rent comparability study only if the term of the original HAP contract had expired and the HAP contract had been renewed pursuant to MAHRA, 111 Stat. at 1384–1424. *See* Tr. 402:2–17; 411:20 to 412:8. The Rohrer Towers II HAP Contract did not expire until March 17, 2011; thus, the rent could not have been reduced in 2002 on the basis of a comparability study. *See also* Tr. 412:9–13 (Arce).

**19.** Requests were resumed in 2004 because Mr. Steenland had been made aware of a decision relating to a rent-assisted project in Ohio, purportedly holding that HUD could not require owners to generate and submit rent comparability studies for Section 8 contracts. *See* Tr. 84:13 to 85:2 (Steenland).

financing history of the Rohrer Towers II project, stating that because bonds which had been issued to provide Haddon Associates with the capital necessary to undertake the project had been subsequently paid in full and the HAP Contract was no longer being used as security for those bonds, "[Housing] Authority desire[d] to assign its interest in the HAP Contract to [Haddon Associates], the owner of the [p]roperty, and [Haddon Associates] ha[d] agreed to accept the assignment of and assume all obligations under the HAP Contract." *Id.* at 2. The agreement stated as well that "[Housing] Authority and [Haddon Associates] mutually desire[d] that the HAP Contract be assigned to [Haddon Associates], and that it is necessary to, and the Contract Administrator and [Haddon Associates] mutually desire[d] to amend the HAP Contract to allow for physical inspections in accordance with 24 CFR Subpart G and require financial reporting in accordance with 24 CFR Subpart H." *Id.* For these reasons, "the parties ... agree[d] [that]: (1) [Housing Authority] ... irrevocably assign[ed][the] HAP Contract to [Haddon Associates] together with all rights and obligations in and under said contract[;] (2) [e]ffective as of the date of th[e] Agreement[,] [Haddon Associates] agree[d] to assume and to be bound by said HAP Contract as modified ..., and is responsible for filing the Annual Financial Statement (AFS) from the date of this Agreement ... [;] (3) [e]ffective as of the date of this Agreement, [Housing] Authority is released from any further liability under the HAP Agreement ... [; and] (4)

Part II of the HAP Contract [is] amended ... to include [the provisions required by HUD regarding physical inspections and financial reporting]." *Id.* The agreement provided that it was "binding upon and shall inure to the benefit of the parties" and "[t]he Secretary [of Housing and Urban Development], by the signature of his authorized representative ..., consent[ed] to the assignment made hereby." *Id.* at 3. All parties signed the agreement. *Id.* at 4.

■ Generally, "[t]wo statutes apply to restrict the manner in which contracts with the [g]overnment and claims against the [g]overnment can be assigned voluntarily: 41 U.S.C. § 15 and 31 U.S.C. § 3727 (2000)." *Delmarva Power & Light Co. v. United States,* 79 Fed.Cl. 205, 214 (2007), *aff'd,* 542 F.3d 889 (Fed.Cir.2008).[20] Section 15 prohibits the assignment of contracts with the government, with exceptions for assignments to banks and financing institutions, while Section 3727 concerns assignment of claims against the government.[21] Often referred to collectively as "the Anti–Assignment Act," these provisions are intended "to protect the [g]overnment from voluntary assignments of contracts or claims to parties *where it has not consented to or recognized the assignment." Delmarva,* 79 Fed.Cl. at 216 (emphasis added); *see also United States v. Shannon,* 342 U.S. 288, 291–92, 72 S.Ct. 281, 96 L.Ed. 321 (1952) (describing the purpose of the Act as preventing persons of "influence" from buying claims against the government

---

**20.** *Delmarva* concerned a so-called "Standard Contract" between a utility and the Department of Energy for the disposal of spent nuclear fuel. *See* 542 F.3d at 890–91. A specific provision in The Nuclear Waste Policy Act of 1982, Pub.L. No. 97–425, 96 Stat. 2201 (Jan. 7, 1983), authorizes the assignment of contracts and claims in conjunction with transfer of title to the spent nuclear fuel involved. *See Dominion Res., Inc. v. United States,* 641 F.3d 1359, 1362–64 (Fed.Cir. 2011) (construing and applying 42 U.S.C. § 10222(b)(3)); *Rochester Gas & Elec. Corp. v. United States,* 65 Fed.Cl. 431, 433 (2005) (same).

**21.** The provisions provide, in relevant part:

No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annul-

ment of the contract or order transferred, so far as the United States is concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

41 U.S.C. § 15(a).

An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727(b).

and precluding the government from incurring multiple liabilities); *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 373, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (same).[22] Because these statutes were enacted for the protection of the government, they may be waived by the government. *See Tuftco Corp. v. United States*, 614 F.2d 740, 745 (Ct.Cl. 1980) (holding that the government may waive the requirements of 41 U.S.C. § 15); *Delmarva*, 542 F.3d at 894 (extending *Tuftco Corp.*'s holding to 31 U.S.C. § 3727); *see also United Pac. Ins. Co. v. United States*, 358 F.2d 966, 969–70 (Ct.Cl.1966); *Maffia v. United States*, 163 F.Supp. 859, 862 (Ct.Cl. 1958). In this regard, the Federal Circuit has instructed: "If ... the government concludes that it is appropriate and in its best interest to accept the assignment, it may do so.... [T]he '[g]overnment's recognition and acceptance of such assignment makes it a valid assignment." *Delmarva*, 542 F.3d at 894 (quoting *Delmarva*, 79 Fed.Cl. at 216).

■ The court looks to the totality of the circumstances to determine whether the government has waived the Anti–Assignment Act, and considers particularly whether: (1) the assignor or assignee sent notice of the purported assignment to the government; (2) the contracting officer signed the notice of assignment; (3) the contracting officer modified the contract according to the assignment; and (4) the government sent payment to the assignee pursuant to the assignment. *Kawa v. United States*, 86 Fed.Cl. 575, 591 (2009) (citing *Tuftco*, 614 F.2d at 745–46). Where, as here, an authorized HUD representative is an actual signatory to the agreement, the government bargains for additional contractual benefits under the agreement, and the contract was modified to reflect the assignment, the government has waived the provisions of the Anti–Assignment Act.

### B. *Privity of Contract*

■ "A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim." *Sullivan v. United States*, 625 F.3d 1378, 1379 (Fed.Cir. 2010); *see also Southern Calif. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed.Cir.2005); *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir. 1984).[23] While this rule is well-established, in the context of assignment of government contracts, its application has led to somewhat discordant results.

In *Insurance Co. of the West v. United States*, 243 F.3d 1367 (Fed.Cir.2001), the Federal Circuit held that a surety of a government contract, while lacking privity of contract, may employ equitable subrogation and "rely on the waiver of sovereign immunity in the Tucker Act [to] bring suit against the United States." 243 F.3d at 1375. In reaching its conclusion, the court made broader statements to the effect that all assignees could invoke the waiver of sovereign immunity for contract claims against the government contained within the Tucker Act, 28 U.S.C. § 1491. After examining the Supreme Court's decision in *Aetna Casualty*, 338 U.S. 366, 70 S.Ct. 207, in which the Court held that Congress' waiver of sovereign immunity under the Federal Tort Claims Act included suits by subrogees, the Federal Circuit concluded that "*Aetna* reflects a broader and more generally applicable legal principle: waivers of sovereign im-

---

**22.** Section 2.20 of plaintiffs' HAP Contract contains an anti-assignment clause, forbidding assignments generally and requiring Housing Authority to obtain prior written consent of HUD for any such action. *See* JX 3 at 25.

**23.** Over time, the Federal Circuit has recognized "limited exceptions to that general rule when a party standing outside of privity 'stands in the shoes of a party within privity.'" *Sullivan*, 625 F.3d at 1380 (citing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed.Cir.1999)). In this regard, the Federal Circuit has "held that suits may be brought against the government in the Court of Federal Claims by an intended third-party beneficiary, *see Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997), by a subcontractor by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages, *see E.R. Mitchell Const. Co. v. Danzig*, 175 F.3d 1369, 1370–71 (Fed.Cir. 1999), ... by a Miller Act surety for funds improperly disbursed to a prime contractor, *see Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160–63 (Fed.Cir.1985)," and by shareholders bringing derivative suits on behalf of a corporation that has contracted with the government. *First Hartford*, 194 F.3d at 1289, 1293.

munity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant." *Id.* at 1373.[24] Because "[t]he language of [the Tucker Act] contains an unequivocal expression waiving sovereign immunity as to claims, not particular claimants," the court concluded that "the Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision such as the Anti–Assignment Act." *Id.* at 1374–75; *see also Webster v. United States,* 90 Fed.Cl. 107, 115 (2009) ("The Tucker Act waives sovereign immunity *for assignees as well as for those holding the original claim,* except as barred by a statutory provision such as the Anti–Assignment Act.") (emphasis added) (citing *Shannon,* 342 U.S. at 292, 72 S.Ct. 281; *Insurance Co. of the West,* 243 F.3d at 1375); *Amber Res. Co. v. United States,* 68 Fed.Cl. 535, 560 (2005) (In *Insurance Co. of the West,* the court "reasoned that the rights of Tucker Act claimants are subject to the common law principle that an assignment transfers an assignor's rights to its assignees, including the right to pursue the rights of its insured against the government."), *aff'd,* 538 F.3d 1358 (Fed.Cir.2008); *Spodek v. United States,* 46 Fed.Cl. 819, 824 (2000) ("The government's recognition of an assignment establishes the requirement of 'privity of contract' between the government and the assignee."); *Johnson Controls World Servs., Inc. v. United States,* 44 Fed.Cl. 334,

345 (1999) ("The required privity of contract between the assignee and the [g]overnment is present if a totality of the circumstances establishes that the [g]overnment has recognized the assignment.").

Contrastingly, other decisions of this court have concluded that "[a] valid assignment without more does not create privity of contract between the assignee and the United States." *Ham Invs., LLC v. United States,* 89 Fed.Cl. 537, 543 (2009) (internal quotation marks omitted), *aff'd,* 388 Fed.Appx. 958 (Fed.Cir.2010); *see also Nelson Constr. Co. v. United States,* 79 Fed.Cl. 81, 87 (2007) ("[A]ssignees cannot recover against the government on a breach of contract claim when there is no privity of contract between the assignee and the government.") (emphasis added); *AG Route Seven P'ship v. United States,* 57 Fed.Cl. 521, 533 (2003) (It is "the clear position of the law that assignees lack privity of contract, even if a valid assignment has occurred."), *aff'd,* 104 Fed.Appx. 184 (Fed.Cir.2004).[25]

Notably, many of the decisions finding no privity despite a valid assignment have relied on a series of cases generated by the predecessor court to the Federal Circuit and this court which addressed the very narrow issue of assignments of the proceeds—not performance—of government contracts. In those circumstances, the assignee was not permitted to bring suit against the government under a breach-of-contract theory because the assignment of proceeds, standing alone, did not create privity of contract between the assignee and the government. *See Produce Factors Corp. v. United States,* 467 F.2d 1343, 1348–49 (Ct.Cl.1972); *Twin City*

---

24. In this regard, the court of appeals noted as well that "Congress'[ ] passage of the Anti–Assignment Act, assumed that, absent a statutory limitation, assignees were free to bring suit against the United States," and "the Supreme Court itself has consistently assumed that the waiver of sovereign immunity contained in the Tucker Act extends to assignees." 243 F.3d at 1375 (citing *Aetna Casualty,* 338 U.S. at 375, 70 S.Ct. 207) (citing in turn *Western Pac. R.R. v. United States,* 268 U.S. 271, 45 S.Ct. 503, 69 L.Ed. 951 (1925); *Seaboard Air Line Ry. v. United States,* 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921); *Erwin v. United States,* 97 U.S. 392, 24 L.Ed. 1065 (1878)).

25. This line of decisions has interpreted *Insurance Co. of the West* as standing only for its most narrow holding: that a subrogee may rely on the Tucker Act to bring suit against the government. *See Ham Invs.,* 89 Fed.Cl. at 543 ("[T]he Federal Circuit has held that an assignee to the proceeds of a government contract may sue to recover payments for work performed under the contract.") (citing *Insurance Co. of the West,* 243 F.3d at 1374–75); *Nelson Constr.,* 79 Fed.Cl. at 88 ("[C]ases subsequent to [*Insurance Co. of the West* ] have agreed that the expansive language ... is mere dicta.") (citing *Centers v. United States,* 71 Fed.Cl. 529, 533 (2006); *Commercial Cas. Ins. Co. of Ga. v. United States,* 71 Fed.Cl. 104, 108 (2006)).

*Shipyard, Inc. v. United States,* 21 Cl.Ct. 582, 588 (1990); *Thomas Funding Corp. v. United States,* 15 Cl.Ct. 495, 499–500, 502 (1988). However, the assignees were permitted to sue the government to recover payments for work performed by the contractor when payment was wrongfully made to a third party, such right arising out of the exceptions to 41 U.S.C. § 15, pursuant to which the assignments were created. *See, e.g., Tuftco Corp.,* 614 F.2d at 747; *Produce Factors,* 467 F.2d at 1348–51; *Twin City Shipyard,* 21 Cl.Ct. at 588; *Thomas Funding,* 15 Cl.Ct. at 502.

■ The Assignment Agreement in this case extends far beyond an assignment of proceeds and would satisfy the most stringent of requisites to show privity of contract. The government was an actual party and signatory to the Assignment Agreement. Indeed, the Assignment Agreement was "made . . . by" plaintiffs and the United States, acting through a representative of HUD. JX 20 at 1; *see also id.* at 4 ("[Housing] Authority, [Haddon Associates], *and the ·Contract Administrator [HUD] have caused this agreement to be executed.*") (emphasis added). The Agreement delegated the entirety of the rights and obligations of the HAP contract to Haddon Associates. *Id.* at 2. HUD not only approved the assignment of the HAP, but specifically contracted pursuant to the Agreement to amend the HAP contract to comply with new regulations regarding physical inspections and financial reporting. *Id.* All of the parties, including HUD, then mutually agreed to the contract assignment and amendments, and representatives from each entity signed the Agreement. *Id.* at 3–4.

■ Where the government is a party to an assignment, privity of contract forms between the assignee and the government, just as it would in any contract to which the government is a party. In this regard, the Federal Circuit has long equated the government's status as an actual signatory to a contract as sufficient to establish privity of contract. *See City Line Joint Venture v. United States,* 503 F.3d 1319, 1322 (Fed.Cir. 2007) (noting that because "HUD was a party to the mortgage agreement which allowed

prepayment without HUD approval after twenty years, [u]nlike in other cases . . . where the court found no breach of contract because HUD was not a party to the mortgage agreements, [plaintiff] has a viable breach of contract claim because it was in privity with respect to the contractual prepayment right"); *Southern Calif. Fed. Sav. & Loan,* 422 F.3d at 1333 (plaintiffs were in contractual privity and could sue the government pursuant to agreement to which both were signatory parties); *Anderson v. United States,* 344 F.3d 1343, 1351 (Fed.Cir.2003) (noting that "[a] signatory to the contractual documents may bring a direct suit for breach of contract").

That the Assignment Agreement was executed subsequent to plaintiffs' filing of their complaint does not pose a barrier to Haddon Associates' inclusion as a plaintiff in this case. The Agreement provided that Haddon Associates was assigned "[the] HAP Contract . . . *together with all rights and obligations in and under said contract.*" JX 20 at 2 (emphasis added). Recently, in *Dominion Resources,* the Federal Circuit addressed whether a provision in the Standard Contract governing the disposal of spent nuclear fuel which provided that "[t]he rights and duties of the Purchaser may be assignable with transfer of title to the SNF" permitted the owner of the SNF to assign also "[a] damages claim for breach along with the transfer of the contract." 641 F.3d at 1362. The assignment itself explicitly provided that it transferred, along with title to the spent nuclear fuel, "all rights of the [assignors] . . . under the . . . Standard Contracts (including all rights to any claims of [assignors] related to DOE defaults thereunder)." *Id.,* 641 F.3d at 1361.

The Federal Circuit concluded that the original owner of the spent nuclear fuel was indeed entitled to transfer the partial breach claims that had accrued prior to the assignment. *Dominion Resources,* 641 F.3d at 1362–64. It explained: "One of the rights of a party to a contract is the right to bring a claim for damages resulting from breach. . . . The 'rights and duties of a party to a contract' encompass not just the party's continuing rights and duties under the contract, but

also the party's existing right to enforce the contract for an ongoing breach and to collect damages that have been incurred." *Id.*, 641 F.3d at 1363 (citing, e.g., *Restatement (Second) of Contracts* § 346); *id.*, 641 F.3d at 1363 (A party's rights under a contract "include[ ] the party's right to collect damages incurred due to an existing, ongoing breach."). Under the court's reasoning in *Dominion Resources*, and in light of the government's consent to the assignment, Housing Authority could have assigned its right to bring suit for the government's prior partial breaches. In this instance, it is evident from the language of the contract and plaintiffs' joint efforts in this litigation that Housing Authority indeed contemplated that Haddon Associates would obtain an interest in the prior and ongoing breach. *See id.*, 641 F.3d at 1363–64 (distinguishing *Ginsberg v. Austin*, 968 F.2d 1198, 1201 (Fed.Cir.1992), and noting that *Ginsberg* "recites no requirement that the transfer of an existing breach of contract cause of action requires a separate, specific, express designation of the claim in the assigning document" but rather allows for "implied[ ] designat[ion]" of accrued causes of action); *see also Campus Sweater & Sportswear Co. v. M.B. Kahn Constr. Co.*, 515 F.Supp. 64, 83–85 (D.S.C. 1979) (property owner who was assigned rights of prior owner during products liability suit could acquire real party in interest status after commencement of action if defendant not prejudiced), *aff'd*, 644 F.2d 877 (4th Cir.1981).

In short, the Assignment Agreement imposes upon the government and Haddon Associates, respectively, the type of "direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract." *National Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436 (Fed.Cir. 1997). The effect of finding privity of con-

tract between a party and the United States is to find a waiver of sovereign immunity. Accordingly, Haddon Associate is a proper plaintiff in this case.[26]

## II. ANNUAL RENT ADJUSTMENTS

The crux of plaintiffs' claim turns on rent adjustments. The parties dispute whether HUD had an obligation to provide an annual rent adjustment for each of the years covered by plaintiffs' claim, *viz.*, that part of 2001 after September 4th, and the years 2002 through 2006 plus 2007 through September 4th.

### A. The "Upon Request" Provision of the HAP Contract

■ The new form HAP Contract signed by the parties provides that "[u]pon request from the Owner to the C[ontract] A[dministrator], Contract Rents will be adjusted on the anniversary date of the Contract." JX 3 at 16 (§ 2.7(d)). From 1990 through 1998, and from 2004 through 2006, plaintiffs submitted requests for rent adjustments. The five-year period in which plaintiffs failed to request adjustments were not due to plaintiffs' belief that they were not obligated to do so; rather, their failure to request adjustments was a product of HUD's prior refusals to grant adjustments in the absence of a rent comparability study, and for one year, a product of the results of a rent comparability study. In sum, the parties' conduct confirms that plaintiffs were required to request annual rent adjustments from HUD. *See Restatement (Second) of Contracts* § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); *id.* § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course

---

26. This resolution would not subject the government to dual or competing liabilities. Haddon Associates and Housing Authority brought these claims together and any potential award of damages would be to those entities jointly.

In addition, in the court's view, given the contractual relationships between the Housing Authority and Haddon Associates—and Haddon Associates' entitlement to the income from Rohrer

Towers II—which relationships were known to HUD, Haddon Associates would have qualified as a real party in interest to this litigation, and joinder of Haddon Associates with Housing Authority as plaintiffs would be proper under RCFC 17.

Moreover, after the assignment, retention of Housing Authority as a plaintiff is proper under the joinder rules of RCFC 20(a)(1).

of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").[27]

The court concurs with the government as well that this provision constitutes a condition precedent. "A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises." R. Lord, 13 *Williston on Contracts* § 38:7 (4th ed. 2000) (*"Williston"*); *see Restatement (Second) of Contracts* § 224 (A condition to a contract is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.").[28] Here, Section 2.7(b)(1) dictates that HUD "will" grant a rent adjustment "[u]pon request" of the plaintiffs. *See* JX 3 at 16. The text of Section 2.7(b) and the parties' course of performance make evident that such provision was indeed an express condition precedent to the grant of rent adjustments under the Rohrer Towers II HAP Contract. *See* 8 C. McCauliff, *Corbin on Contracts* § 31.1 (rev. ed. 1999) (*"Corbin"*) ("We have an express condition whenever the parties have used language that makes some fact or event necessary to the creation of the right and duty of immediate performance of a promise, or makes it operative to extinguish such a right and duty.").

Generally, a condition precedent "must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies." *Williston* § 38:7; *see also Restatement (Second) of Contracts* § 225(1) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occur-

rence is excused."); 2 E. Allan Farnsworth, *Contracts* § 8.1 (3d ed. 2004) (*"Farnsworth"*) ("In general, a party whose duty is conditioned on [a condition precedent] is not required to perform unless the event has occurred."). Plaintiffs contend, however, that the requirement of the 1994 Amendments and Notice 95–12 that a property owner submit a rent comparability study attendant to a rent request and HUD's subsequent refusal to grant rent adjustments to Rohrer Towers II constituted a partial repudiation and breach of the HAP contract, thereby excusing plaintiffs' non-compliance with Section 2.7(b). Pls.' Post–Trial Br. at 9. The government responds that there was no breach of contract in this case because the "upon request" language must be interpreted as meaning that plaintiffs "had no entitlement to annual adjustments." Def.'s Post–Trial Br. at 16; Cl. Tr. 40:12–15 ("There's no direct beach of [Section] 2.7(b) by requiring owners to submit rent comparability studies along with their request. Nothing in the contract says that's a breach."). Alternatively, the government contends that because the "upon request" provision constitutes a condition precedent to HUD's grant of an annual rent adjustment, even if HUD breached the HAP Contract, plaintiffs' failure to request rent increases for the years 2001 through 2003 precludes them from recovering for those years. *See* Def.'s Post–Trial Br. at 8, 13.

### B. *Liability for Breach of Contract*

Prior decisions of this court have considered breach of contract claims based upon the 1994 Amendments in the context of old-form HAP contracts. In those cases, the

---

**27.** Plaintiffs argue that the AHAP's allowance of automatic rent adjustments suggests that the HAP Contract also was intended to grant automatic adjustments. *See* Pls.' Post–Trial Br. at 7–8. In this regard, plaintiffs point to Mr. Steenland's mistaken belief that the HAP Contract ultimately executed reflected the same terms appended to the AHAP, and argue that such belief excuses plaintiffs' failure to request rent adjustments. *See id.* While the attachment of the old-form HAP contract in the AHAP and the subsequent employment of the new-form HAP contract for the executed contract is an unfortunate chain of events which undoubtedly could have led to some confusion on plaintiffs' part as to their responsibilities under the HAP Contract, the par-

ties are bound by the contract they ultimately executed. *See Giesler v. United States,* 232 F.3d 864, 869–71 (Fed.Cir.2000). Plaintiffs' failure to address the precise terms of the agreement prior to its execution cannot excuse nonperformance of provisions which diverge from an earlier agreement. *See Richardson Camera Co. v. United States,* 467 F.2d 491, 496 (Ct.Cl.1972).

**28.** The *Restatement* avoids the traditional terms of "condition precedent" and "condition subsequent" and instead uses the terms "condition" and "discharge." *See Restatement (Second) of Contracts* § 224 cmt. e.

court uniformly concluded that the Amendments and HUD's policies reflected in Notice 95–12 indeed constituted a breach of contract, and accordingly granted relief for those years in which plaintiffs were denied rent adjustments because they had failed to submit rent comparability studies. *See Park Props. Assocs., L.P. v. United States,* 74 Fed.Cl. 264, 274 (2006) (*"Park Properties I"*); *Statesman II Apartments, Inc. v. United States,* 66 Fed.Cl. 608, 627 (2005); *Cuyahoga Metropolitan Hous. Auth. v. United States,* 57 Fed.Cl. 751, 781 (2003) (*"Cuyahoga I"*). This is the first instance, however, in which this court has had occasion to consider whether the 1994 Amendments and HUD's actions pursuant to that legislation constituted a breach of the new-form HAP contract. Two district courts, however, have addressed this question.

In *Greenleaf L.P. v. Illinois Housing Development Authority,* 2010 WL 3894126, at *1 (N.D.Ill. Sept. 30, 2010), Sandburg and Greenleaf, two limited partnerships, had entered into separate HAP contracts with the Illinois Housing Development Authority ("Illinois Authority"). Sandburg's contract was an old-form HAP contract, while Greenleaf's was a new-form HAP contract. The district court concluded that the upon-request provision of Greenleaf's contract was "a condition precedent to [the Illinois Authority's] performance under the Contract." *Id.,* at *5. Relying on the prior decisions of this court, Greenleaf contended that strict compliance with the condition was not required because the Illinois Authority had repudiated the HAP contract. *Id.* The district court rejected this argument, stating that this court's prior decisions were distinguishable because "those decisions were based on the premise that the HAP Contracts provided for auto-

*matic* annual adjustments of Contract Rents, a provision[ ] that is not present in Greenleaf's Contract." *Id.*[29]

More recently, in *Cathedral Square Partners L.P. v. South Dakota Housing Development Authority,* 2011 WL 43019, at *1–3 (D.S.D. Jan. 5, 2011), multiple plaintiffs entered into HAP contracts with the South Dakota Housing Development Authority, but only one such contract was a new-form HAP contract—that of West Park Ltd. Facing the same arguments as those made by Greenleaf, the district court concluded that the "upon request" provision was a condition precedent to receiving a rent adjustment. *Id.,* at *8. The court likewise rejected West Park's excusal argument "for the same reasons as those stated in the *Greenleaf* decision." *Id.,* at *9.

The prior relevant decisions of this court indeed relied upon the fact that the old-form HAP contracts provided for automatic annual adjustments in concluding that the operation of the 1994 Amendments and HUD Notice 95–12 constituted a breach of contract. *See Park Properties I,* 74 Fed.Cl. at 273–74; *Statesman II,* 66 Fed.Cl. at 616–20; *Cuyahoga I,* 57 Fed.Cl. at 759–62. This fact does not, however, preclude the possibility that the Amendments and HUD's actions were a breach of the new-form HAP contracts, regardless of the requirement that a property owner request a rent adjustment. In this connection, merely stating the difference between the old-form and new-form HAP contracts is an insufficient basis to reject plaintiffs' contentions.

As the court in *Cuyahoga* noted, "[t]o determine whether plaintiff[s'] contractual rights were breached, the court first must determine what those rights are." 57 Fed.

---

**29.** The district court's decision in *Greenleaf* nonetheless treated as a breach for some purposes the requirement in the 1994 Amendments and Notice 95–12 that the housing provider supply a rent comparability study as a condition to receiving a rent increase. Although the court rejected Greenleaf's contention that the 1994 Amendments and HUD's implementing actions breached its contract, *see* 2010 WL 3894126, at *5, the court nonetheless concluded that Greenleaf was entitled to recover the cost of a rent comparability study it had submitted to HUD. *Id.,* at *8. In this regard, the *Greenleaf* court

stated "[e]ven though the language in Greenleaf's contract differs from the language in *Statesman II,* the analysis [referring to the court's finding in *Statesman II Apartments, Inc. v. United States,* 71 Fed.Cl. 662, 670 (2006) that '[c]ontractually, the costs of performing such studies should not have been imposed on the plaintiffs, and plaintiffs must be allowed to recover such costs to be put in as good a position as they would have been but for the breach'] still applies. Notice H 95–12 added a condition to receiving rent adjustments that was not contained in Greenleaf's contract." *Id.,* at *8 n. 2.

Cl. at 759 (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir.1989)). In this endeavor, the court looks first to the plain language of the contract. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed.Cir.2010); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed.Cir.2004). "When the contract language is unambiguous on its face, [the] inquiry ends, and the plain language of the contract controls." *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed.Cir.2002); *see also Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1379 (Fed.Cir.2009) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls.") (internal quotation marks omitted) (quoting *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed.Cir.2002)). "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *NVT*, 370 F.3d at 1159; *see also Hercules*, 292 F.3d at 1381.

Section 2.7(b)(1) of the HAP provides: "Upon request from the Owner to the C[ontract] A[dministrator], Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R. [Part] 888 and this Contract." JX 3 at 16.[30] While plaintiffs are plainly required to request an adjustment, the Contract provides with equal clarity that HUD was under a duty to provide such adjustment following the request. In this regard, although the new-form HAP contract utilizes "will" in place of "shall," the disparate word choice does not obviate HUD's duty to provide rent adjustments. The Federal Circuit has stated unequivocally: " 'Will' is a mandatory term, not a discretionary one." *United States v. UPS Customhouse Brokerage, Inc.*, 575 F.3d 1376, 1382 (Fed.Cir.2009) (citing *New England Tank Indus. of N.H., Inc. v. United States*, 861 F.2d 685, 694 (Fed.Cir.1989)) (construing a provision of 19 C.F.R. § 111.1 stating that Customs and Border Protection "will consider" certain factors to determine whether a customs broker exercises "responsible supervision and control" to mean that Customs was required to consider such factors); *see also Britell v. United States*, 372 F.3d 1370, 1378 (Fed.Cir.2004) ("This and other courts have repeatedly held that this type of mandatory language, e.g., 'will pay' or 'shall pay,' creates the necessary 'money-mandate' for Tucker Act purposes."); *Massie v. United States*, 166 F.3d 1184, 1190 (Fed.Cir.1999) ("The language specifying that the annuity 'will result in distributions' and that the disbursements 'shall be paid' is unambiguously mandatory."); *New England Tank Indus.*, 861 F.2d at 694 ("[W]ill" and "will not" are "mandatory terms" as contrasted to "directory terms" such as "should."); *Webster's Third New Int'l Dictionary* 2617 (2002) (defining "will" as, among other things, "used to express a command, exhortation, or injunction").[31]

An internal HUD memorandum from 1986 provides further interpretive insight in this regard. That memorandum, entitled "Questions and Answers on Section 8 Annual Rent Adjustments," provided detailed directions for HUD officials regarding rent adjustments for new-form HAP contracts. It stated, "[i]f an owner does not request an annual adjustment by the HAP anniversary date, keep the contract rents at their current levels." JX 44 at 149. It continued: "[i]f the owner requests a rent adjustment, use the instructions in Answer # 2B [providing that "[a] material difference exists whenever the ad-

---

**30.** As noted, the relevant portion of regulations in place at the time of contract execution, entitled *"Automatic Annual Adjustment of Contract Rents,"* provided similarly that "[u]pon request from the owner to the contract administrator, contract rents *will* be adjusted on the anniversary date of the contract in accordance with 24 C.F.R. Part 888." 24 C.F.R. § 880.609(a) (1980) (emphasis added).

**31.** Indeed to suggest otherwise would be to contend that the government possessed the right under the contract to grant or deny rent requests at whim. There are no standards contained within the contract or the regulations applicable during the time of contract execution for how such a decision would be made, and it could hardly have been the mutual understanding of the contract that plaintiffs agreed to provide low-income housing for a thirty-year term in exchange for rental assistance payments from HUD, which payments HUD could have elected to freeze at 1981 rates.

justed Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference"] to determine if a market analysis is needed." *Id.* at 146, 149. The memorandum then dictated the effective date of such adjustments, the date being dependent on when the owner submitted the request in relation to the contract anniversary date. *Id.* at 149. At no point does the memorandum contemplate that property owners subject to new-form HAP contracts did not have an "entitlement" to such adjustments such that HUD could outright deny requests for adjustments.

With the exception that property owners subject to new-form HAP contracts are required to request the rent adjustment, HUD's duty to perform once such a request has been made is qualified only by the "overall limitation" clause in Section 2.7(d), which provides that "[n]othwithstanding any other provisions of this [c]ontract, adjustments after [c]ontract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, *as determined by HUD*." JX 3 at 16 (§ 2.7(d)).[32] In this connection, the Supreme Court's pronouncements in *Cisneros* prove just as relevant to interpreting the new-form HAP contract as they were to this court's consideration of the old-form HAP contract. As the Supreme Court observed, "[the overall limitation clause] *expressly assigns to [HUD] the determination of whether there exist material differences* between the rents charged for assisted and comparable unassisted units." *Cisneros,* 508 U.S. at 21, 113 S.Ct. 1898. The Court continued: "It is only in those *presumably exceptional cases* where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue." *Id.* at 19, 113 S.Ct. 1898. These statements from the Court cannot be read in harmony with the government's offered reading of the new-form HAP contract. If, under the overall limitation clause, a rent comparability study would only become pertinent if the Secretary had reason to believe

that the adjustment factors were resulting in rents materially higher than those for unassisted units, then Section 2.7(b)(1) cannot be read to encompass the requirement that property owners submit—as an ordinary matter of course and as an absolute obligation—an annual rent comparability study. As the court in *Statesman II* noted, while "HUD may exercise its discretion in effecting its mandate to determine 'which units are comparable, what rents are charged for those comparable units, and whether AAAF-based adjustments would result in differences between assisted and comparable unassisted rents that are 'material,'" HUD could not "abdicate its duty to make any or part of these determinations or ... impose that duty on its contracting counterparties by first requiring them to conduct studies and then requiring that the studies show no material differences." 66 Fed.Cl. at 618 (quoting *Park Village Apartments v. United States,* 32 Fed.Cl. 441, 447 (1994), *aff'd,* 152 F.3d 943 (Fed.Cir.1998) (table)).

The statutory scheme governing the new-form HAP contract bears on this inquiry as well. When plaintiffs' HAP contract was signed, the Housing Act stated that HAP contracts "*shall provide for an adjustment annually or more frequently in the maximum monthly rents* for units covered by the contract to reflect changes in the fair market rentals...." 42 U.S.C. § 1437f(c)(2)(A) (1976 & Supp. V 1982). In 1987, Congress amended the Housing Act to permit HUD to use rent comparability studies, at the same time imposing upon HUD a sixty-day window in which it could generate and submit such a study to the property owner. Housing and Community Development Act of 1987, § 142(c)(2)(B). In 1989, Congress amended further that provision to require the Secretary to conduct rent comparability studies "for projects where the Secretary has reason to believe that the application of the [AAAF] ... would result in ... material differences" but maintained the sixty-day limitation. Department of Housing and Urban Development Reform Act of 1989, 103 Stat. at 2057–

---

**32.** The old-form HAP contracts stated that the material differences could not result "as deter-

mined by the [g]overnment." JX 2 at 14.

59. As the court in *Cuyahoga I* aptly observed, both of these Acts "limited how and when HUD could exercise this authority" and the fact that Congress imposed limits runs contrary to the government's contention that "HUD always had the power, under the original Section 8 program, to require the project owners to present a comparability study as a precondition to receiving an adjustment." 57 Fed.Cl. at 762. Indeed, the very fact that Congress enacted the 1994 Amendments to the Housing Act to impose upon owners the burden of supplying comparability studies undercuts the assertion that such power was latent in the contracts themselves. *See id.* ("[U]nlike with the 1987 Act, there is not the slightest hint in the legislative history that Congress believed that the 1994 Amendments confirmed a preexisting right.").

Nor can the words "upon request from the owner to the C[ontract] A[dministrator]" be read so expansively as to encompass the burden of supplying a comparability study with such a request. A request means just that—a request. This plain language, which simply requires property owners to go through the formality of initiating a rent request, does not stretch so far as to encompass the burden of supplying rent comparability studies attendant to that request. In this vein, the court reiterates an observation made in *Statesman II*: "For items for which the duty of performance is placed on the owner, the language of the contract makes the existence of the duty, and the party to which that duty is assigned, explicit." 66 Fed.Cl. at 618; *see, e.g.,* JX 3 at 16 (§ 2.7(c)) ("Special additional. adjustments shall be granted, when approved by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units.... *The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase.*"); *id.* at 13 (§ 2.4(h)(1)) (listing the items the owner must submit with monthly requests for HAP payments). In contrast, Section 2.7(b) imposes no requirement for submission of a comparability study.

For these reasons, the court concludes that the 1994 Amendments and HUD's subsequent implementing actions, including adop-

tion of Notice 95–12, constitute a breach of plaintiffs' Contract. The court's decision as to this issue resolves HUD's liability for the years 2004 through 2006, years for which plaintiffs timely requested and were denied rent adjustments by HUD due to plaintiffs' failure to include rent comparability studies. In 2007, which year is partially covered by this action, plaintiffs submitted a rent comparability study and were granted a rent adjustment. Because HUD's requirement that plaintiffs provide such study was a breach of contract, plaintiffs are entitled to recover the cost of preparing that study. *See Statesman II Apartments, Inc. v. United States,* 71 Fed.Cl. 662, 670 (2006) ("Contractually, the costs of performing such studies should not have been imposed on the plaintiffs, and plaintiffs must be allowed to recover such costs to be put in as good a position as they would have been but for the breach."). Still at issue is the question of the government's liability for rent increases for a part of 2001 and the years 2002 and 2003 because plaintiffs submitted no requests for adjustments for those years.

### C. Excusal of Plaintiffs' Nonperformance of the Condition Precedent

The government avers that notwithstanding any finding that HUD breached plaintiffs' HAP contract, plaintiffs' failure to fulfill the condition precedent of requesting rent adjustments for the years 2001 through 2003 releases HUD from any duty it had to grant rent adjustments for those years. *See* Def.'s Post–Trial Br. at 8, 13. Plaintiffs contend that the government's partial repudiation and breach of contract excuses plaintiffs' non-compliance with the request provision. Pls.' Post–Trial Br. at 9.

■ Though plaintiffs do not invoke the canon by name, they rely essentially upon the long-established "doctrine of prevention" to excuse their non-performance. Described aptly by *Williston,* the doctrine provides:

Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform.... [I]n such a case, the promisor may not

invoke the other party's nonperformance as a defense when sued upon the contract. *Williston* § 39:3; *see also id.* at § 39:4 ("In effect, where one improperly prevents the performance or the happening of a condition of his or her own promissory duty, the offending party thereby eliminates it as a condition or, viewed another way, the condition is considered as waived or fulfilled."). *Corbin* addresses the issue in similar fashion: "One who unjustly prevents the performance or the happening of a condition of promissory duty thereby eliminates it as a condition." *Corbin* § 40.17. "In short, under the doctrine of prevention, where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party *cannot in any way take advantage of that failure.*" *Williston* § 39:3 (emphasis added).[33] The doctrine applies equally to contracts with the government and has been invoked by this court on repeated occasions. *See Park Properties II,* 82 Fed.Cl. at 171–73; *Hansen Bancorp, Inc. v. United States,* 67 Fed.Cl. 411, 424 (2005), *appeal dismissed,* 180 Fed.Appx. 930 (Fed.Cir.2006); *Tennessee Valley Auth. v. United States,* 60 Fed.Cl. 665, 672 (2004); *Bank of Advance v. United States,* 6 Cl.Ct. 535, 538 n. 3 (1984).

The "prevention" may take many forms, including a breach of a contractual duty, whether express or implied, such as the duty of good faith and fair dealing. On this, *Farnsworth* states:

> An obligor may excuse a condition of its duty by committing a breach that causes the nonoccurrence of the condition. When the condition is excused, the obligor's duty becomes absolute. The breach may take the form of nonperformance, either by prevention or by failure to cooperate, or it may take the form of a repudiation.

*Farnsworth* § 8.6; *see also Restatement (Second) of Contracts* § 245 ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."); *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 212 (2d Cir. 2002) ("The prevention doctrine is substantially related to the implied covenant of good faith and fair dealing implicit in every contract.... The implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate the occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence.") (quoting *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.,* 807 F.Supp. 1007, 1022 (S.D.N.Y.1992)); *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.,* 964 F.2d 694, 696

---

**33.** The well-established juridical roots of the prevention doctrine are evidenced by Justice Holmes' opinion for the Supreme Court in *St. Louis Dressed Beef & Provision Co. v. Maryland Casualty Co.,* 201 U.S. 173, 181, 26 S.Ct. 400, 50 L.Ed. 712 (1906), in which the Court stated: "In general, when one party, by his fault, prevents the other party to a contract from entitling himself to a benefit under it according to its terms, the former is liable for the value of that benefit, less the value or cost of what the plaintiff would have had to do to get it." The doctrine remains equally viable today. *See, e.g., In re Peanut Crop Ins. Litigation,* 524 F.3d 458, 474 (4th Cir.2008) ("[I]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance ... of a condition upon which his own liability depends, he cannot take advantage of that failure.") (quoting *Fuller Co. v. Brown,* 15 F.2d 672, 678 (4th Cir.1926)) (internal quotation marks omitted); *Northeast Drilling, Inc. v. Inner Space Servs., Inc.,* 243 F.3d 25, 40 (1st Cir.2001) ("Under the so-called prevention doctrine, a contractual condition precedent is deemed excused when a promisor hinders or precludes fulfillment of a condition and that hindrance or preclusion

contributes materially to the nonoccurrence of the condition."); *Moore Bros. Co. v. Brown & Root, Inc.,* 207 F.3d 717, 725 (4th Cir.2000) ("The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused."); *Mendoza v. COMSAT Corp.,* 201 F.3d 626, 631 (5th Cir.2000) ("The doctrine of prevention ... provides that when a promisor wrongfully prevents a condition from occurring that condition is excused."); *Apalucci v. Agora Syndicate, Inc.,* 145 F.3d 630, 634 (3d Cir.1998) ("As a general rule, when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."); *Park Props. Assocs., L.P. v. United States,* 82 Fed.Cl. 162, 171 (2008) ("*Park Properties II*") ("Cases illustrating the prevention principle 'are legion.'") (quoting *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1255 (D.C.Cir.1979) (quoting in turn 5 *Williston on Contracts* § 677 at 225 (3d ed. 1961))).

(7th Cir.1992) (Fulfillment of a condition precedent "is excused by a breach of a contract if the breach caused the failure of the condition precedent.").

■ The covenant of good faith and fair dealing is implied in every contract, including those with the government. *See Essex Electro Engr's, Inc. v. Danzig,* 224 F.3d 1283, 1291 (Fed.Cir.2000). The Federal Circuit has described the covenant as a duty:

> This covenant reflects the duty that each party owes to its contracting partners. As Professor Williston explained, such a covenant underlines every contract: The underlying principle is that there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . . .

*First Nationwide Bank v. United States,* 431 F.3d 1342, 1349 (Fed.Cir.2005) (quoting 5 *Williston on Contracts* § 670 (3d ed. 1961)); *see also Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir.2005) ("The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.").

■ It is not required that the breach have been the but-for cause of the failure to perform the condition precedent; "[i]t is only required that the breach have contributed materially to the non-occurrence." *See Restatement (Second) of Contracts* § 245 cmt. b; *see also Williston* § 39:9 ("Under the doctrine of prevention, interference by one party to a contract need not make performance . . . legally impossible or impracticable in order for the interference to amount to prevention and constitute an excuse for nonperformance. Rather it is as effective an excuse for nonperformance of a condition precedent to a promisor's obligation that the promisor has wrongfully hindered performance of the condition."). If, however, performance of the condition "would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and

the rule does not apply." *Restatement (Second) of Contracts* § 245 cmt. b.

■ The evidence adduced at trial makes plain that plaintiffs' failure to initiate a request in 2001 and 2003 was a direct result of HUD's refusal to grant plaintiffs rent adjustments for the years 1996 through 1998 despite plaintiffs' requests because rent comparability studies were not provided. Tr. 234:9–13 (Simpkins) ("After asking for requests for three years and being denied for three years . . . I didn't feel as though if I sent a letter every day they would [grant an adjustment]—[rather] I would receive the same response."). HUD's refusal, stemmed, of course from the 1994 Amendments and Notice 95–12 and plaintiffs' concomitant failure to supply a rent comparability study. In this way, the government contributed materially to the prevention of the condition precedent by breaching not only its express duty to grant rent adjustments "upon [plaintiffs'] request" but also its duty of good faith and fair dealing under the contract. The government thus "changed the balance of contract consideration" by unilaterally imposing upon plaintiffs additional contractual duties not within the terms of the contract. *First Nationwide Bank,* 431 F.3d at 1350. Consequently, it may not now seek to benefit from its breach. *See Williston* § 39:6 (It is a "long-established principle of law that one should not be able to take advantage of his or her own wrongful act.").

In short, plaintiffs' failure to fulfill the condition precedent of submitting rent requests is excused; HUD was accordingly required to grant rent increases to plaintiffs for years 2001 and 2003 regardless of the absence of a request. *See Farnsworth* § 8.6 ("When the condition is excused, the obligor's duty becomes absolute."); *Restatement (Second) of Contracts* § 245 cmt. a (A breach that contributes materially to the non-occurrence of a condition precedent "has the further effect of excusing the non-occurrence of the condition itself, so that performance of the duty that was originally subject to its occurrence can become due in spite of its non-occurrence.").

For the year 2002, however, an intervening consideration guided plaintiffs' decision to forego rent requests. As noted, in 2002, plaintiffs retained Axiom Corporation and obtained from that company a rent comparability study. The study revealed that the estimated market rent was below that which Rohrer Towers II was then receiving. Plaintiffs then contacted a representative at NJHMFA, Mr. Collins, who informed plaintiffs that owners who submitted comparability studies with such results would face a potential reduction of contract rent. Due to the findings of the study and the contract administrator's advice, plaintiffs abstained from submitting a rent adjustment request. From this evidence, it appears that plaintiffs' decision to forego a rent request for the year 2002 would have occurred regardless of HUD's prior refusal to grant a rent increase in the absence of a rent comparability study. Thus, it cannot be said that the government's previous denials contributed materially to plaintiffs' failure to request a rent increase in 2002. *See Restatement (Second) of Contracts* § 245 cmt. b. Accordingly, HUD is not liable for rent adjustments for that year.[34]

### D. *Implications of a Partial Breach of a Continuing Contract*

The government makes much of the fact that the breach of contract in this case was necessarily only partial, and that plaintiffs continued to perform under the contract subsequent to the alleged breaches. *See* Def.'s Mem. of Contentions of Fact and Law ("Def.'s Mem.") at 12–13; Cl. Tr. 29:4–15. It argues that "a party cannot claim anticipatory repudiation or prior material breach when both parties continue to perform fully under the contract," and these doctrines "apply only in the event of a 'total breach' by one party, which excuses nonperformance of the contract by the other party." Def.'s Mem. at 12 (citing *Amber Res.*, 538 F.3d at 1369, and *Restatement (Second) of Contracts* § 243).

While plaintiffs indeed contend that the 1994 Amendments and HUD Notice 95–12 *partially* repudiated the HAP contract, *see* Pls.' Post–Trial Br. at 9, the factual background of this case and the nature of plaintiffs' suit demonstrate that they do not bring their case pursuant to the theory of *anticipatory* repudiation; rather, they allege partial breach of contract. *See* Cl. Tr. 10:7–24. Undoubtedly, the 1994 Amendments and HUD Notice 95–12 constituted an anticipatory repudiation of *part* of the contract. *See Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed.Cir.2005) ("An anticipatory repudiation is a 'renunciation of a contractual duty *before* the time fixed in the contract for ... performance.'") (quoting *Franconia Assocs. v. United States*, 536 U.S. 129, 143, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002)); *see also Restatement (Second) of Contracts* § 250. However, "[f]or an aggrieved party to recover damages for an anticipatory repudiation, it must elect to treat the repudiation as a total breach." *Indiana Mich. Power*, 422 F.3d at 1374 (citing *Franconia*, 536 U.S. at 143, 122 S.Ct. 1993); *see also Franconia*, 536 U.S. at 143, 122 S.Ct. 1993 ("[A] repudiation ripens into a breach prior to the time for performance only if the promisee elects to treat it as such.") (internal quotation marks omitted). Alternatively, " '[i]f the injured party elects to or is required to await the balance of the

---

34. Plaintiffs contend that "elementary fairness" dictates that the government be estopped from refusing a rent adjustment for the year 2002 because plaintiffs relied on the advice of Mr. Collins of NJHMFA in electing to forego a rent request. *See* Pls.' Mem. of Contentions of Fact and Law ("Pls.' Mem.") at 17–19. The regrettable circumstance of Mr. Collins' providing inaccurate information regarding potential rent reduction for the Rohrer Towers II contract does not compel a different result. As the government points out, Congress amended the Housing Act in 1987 to prohibit the downward adjustment of contract rents, unless the HAP contract had been refinanced to reduce the periodic payments of the owner (or subsequently renewed). *See* Def.'s Post–Trial Br. at 18 (citing Housing and Community Development Act of 1987, § 142(d)). In this respect, "those who deal with the [g]overnment are expected to know the law and may not rely on the conduct of [g]overnment agents contrary to law." *Heckler v. Community Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *see S.J. Amoroso Constr. Co., Inc. v. United States*, 12 F.3d 1072, 1075 (Fed.Cir.1993) ("[T]he United States is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations.").

other party's performance under the contract, [its] claim is said instead to be one for damages for partial breach.'" *Indiana Mich. Power*, 422 F.3d at 1374 (quoting *Restatement (Second) of Contracts* § 236 cmt. b); *Old Stone Corp. v. United States*, 450 F.3d 1360, 1371 (Fed.Cir.2006) ("When a non-breaching party elects to continue performance, that party is said to elect to treat the breach as partial rather than total."); *Farnsworth* § 8.15 ("If the injured party does not terminate the contract, either because that party has no right to or does not choose to, the injured party is said to treat the breach as *partial*.").[35]

Putting aside the question of whether plaintiffs would have been successful had they alleged the 1994 Amendments and Notice 95–12 constituted a total breach of contract and brought suit at that time, plaintiffs elected to continue performance under the contract and brought a partial-breach-of-contract suit. The government's contention that plaintiffs are somehow precluded from bringing such a claim due to the parties' continued performance under the contract is directly contrary to the spent nuclear fuel cases which have permitted—and ultimately awarded damages to plaintiffs—in precisely the same partial-breach, continuing-performance scenario. *See, e.g., Dominion Res.*, 641 F.3d at 1361; *Southern Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1298 (Fed.Cir. 2011); *Yankee Atomic Elec. Co. v. United*

*States*, 536 F.3d 1268, 1272 (Fed.Cir.2008); *Indiana Mich. Power*, 422 F.3d at 1373–74.[36]

Correlatively, the government's contention that plaintiffs may not rely on the partial breach of contract as excusing plaintiffs' nonperformance of the condition precedent—which condition was tied to the specific duty the government breached—is misplaced. In cases of partial breach, the parties are indeed bound to continue performance under the contract. *See Yankee Atomic*, 536 F.3d at 1281 (In partial breach cases, "[a]ll parties ... retain their substantive rights and obligations under the contract."); *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir.2006) ("If a breach is only partial, it may entitle the non-breaching party to damages for the breach, but it does not entitle him simply to treat the contract as at an end."); *Williston* § 39:32 (Where a non-breaching party elects to treat a default by the other party as only a partial breach, "the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain."). This basic maxim governing parties' performance obligations under partial-breach-of-contract circumstances does not, however, annul all other doctrines of contract law, such that the parties' rights and duties under the contract are rendered impervious to subsequent

---

**35.** Sometimes called the doctrine of "election," *Williston* describes the non-breaching party's options as follows:

> When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach—but the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain

*Williston* § 39:32.

**36.** As support for its argument on this point, the government relies on *Amber Resources*, 538 F.3d 1358. In *Amber Resources*, lessees of oil and gas contracts granted by the government sued for total breach of contract based upon amendments to the Coastal Zone Management Act ("CZMA"), Pub.L. No. 92–583, 86 Stat. 1280 (1972). 538

F.3d at 1363, 1366. The Federal Circuit concluded that because "the parties to the lease agreements all treated the agreements as unaffected by the 1990 CZMA amendments, ... the 1990 enactment itself did not constitute either a breach or an anticipatory repudiation that gave the lessees a right to restitution at that time." *Id.* at 1369–70. The court concluded that a later district court decision, which clarified the scope of the 1990 amendments and caused the government to treat the leases as subject to the 1990 amendments, constituted a repudiation of the leases. *Id.* at 1370. Quite apart from *Amber Resources*, in this case, HUD immediately applied the 1994 Amendments to plaintiffs' HAP Contract and has continued to do so for the past seventeen years. Neither party performed as though plaintiffs were *not* subject to the amendments; rather, the parties continued to perform their respective duties that fell outside the scope of the 1994 amendments.

events. Indeed, to find that a non-breaching party subject to a partially-breached contract may not avail itself of any doctrines of contract law which serve to protect non-breaching parties—despite later circumstances justifying their invocation—is to punish those parties who continue to perform under such circumstances.

There is no dispute that after the 1994 Amendments and HUD Notice 95–12, plaintiffs continued to meet all of their substantive obligations under the contract, providing safe, clean, and affordable housing to low-income tenants. HUD's refusals to grant rent adjustments in 1996, 1997, and 1998 after plaintiffs had made rent adjustment requests, support application of the doctrine of prevention for post–1998 years. HUD's refusals were further breaches that contributed materially to the non-occurrence of a condition precedent. In this vein, the pertinent *Restatement* provision, recognizing that there are multiple rights and duties under a contract, explicitly provides: "[w]here a party's breach by non-performance contributes materially to the non-occurrence of *a condition* of *one of his duties*, the *non-occurrence is excused.*" *Restatement (Second) of Contracts* § 245 (emphasis added).[37]

### III. *THE ONE–PERCENT REDUCTION IN THE ANNUAL ADJUSTMENT OF RENT FOR NON–TURNOVER UNITS*

■ The 1994 Amendments modified the administration of HAP contracts in additional respects beyond the requirement of rent comparability studies. In particular, Congress amended 42 U.S.C. § 1437f(c)(2)(A) to provide a mandatory one-percent reduction in the annual adjustment for non-turnover units:

> For any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, 108 Stat. at 2315.[38] Plaintiffs allege that this provision constitutes a breach of their HAP Contract and "is also arbitrary in its application." Pls.' Post-Trial Br. at 18. The government responds that the 1994 Amendments and the HAP Contract "reserve to HUD the discretion to determine the [A]AAFs," and "HUD reasonably exercised its discretion to adopt and apply a one-percent reduction in the [A]AAFs for units not experiencing turnover within a contract year." Def.'s Post–Trial Br. at 28, 31.

The prior decisions of this court that have considered the 1994 Amendments in the context of the old-form HAP contracts have addressed also the one-percent reduction. The old-form HAP contracts provide, in pertinent part: "[AAAFs] will be determined by the [g]overnment at least annually; interim revisions may be made as market conditions

37. Plaintiffs raise a set of other arguments regarding rent adjustments, including the related contention that the request provision was excused by futility, that the requests should be granted because the request provision was merely procedural and the government will not suffer prejudice from retroactive adjustments, and that the substantial forfeiture to plaintiffs that would result from the denial of adjustments excuses their failure to request adjustments. *See* Pls.' Post-Trial Br. at 11–17. The court's disposition of plaintiffs' argument regarding excusal by breach renders unnecessary consideration of these arguments.

In this regard, the court need not address the government's motion for leave to file an objection to plaintiffs' post-trial reply brief, filed April 26, 2011. In that motion, the government contests plaintiffs' invocation of forfeiture, alleging that plaintiffs are precluded from relying upon that doctrine because they raised it for the first time in their post-trial reply brief. Because the court has reached its decision on other grounds, the government's motion is denied as moot.

38. This portion of the Section was amended in 1996 to insert an exception prior to the text providing the mandatory one-percent limitation, namely, "[e]xcept for assistance under the certificate program." *See* Pub.L. No. 104–204, § 201(g), 110 Stat. 2893 (Sept. 26, 1996). Thus, the mandatory one-percent reduction for non-turnover units does not apply uniformly to all HUD rent assistance contracts under the Section.

warrant. Such Factors and the basis for their determination will be published in the Federal Register." JX 2 at 14. On the basis of this language, *Statesman II* held that the one-percent reduction breached the old-form HAP contract because HUD did not comply with the requirement that the basis for the reduction be published in the *Federal Register* nor was there any evidence then before the court that HUD relied upon congressional findings of fact in adopting the one-percent reduction. 66 Fed.Cl. at 625. On the other hand, in *Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed.Cl. 534, 542 (2005) ("*Cuyahoga II*"), the court upheld the reduction, finding that the old-form HAP contract did not require "a single, monolithic factor for all units at a given property." A similar result was reached in *Park Properties I*, in which the court noted that the "basis" for the AAAF reduction could have been legal, rather than factual, and "nothing in the contract[] explicitly precludes HUD from citing, as the basis for a rate determination, legislation that effected a modification of the adjustment factors, provided that the law did not repudiate or breach the contract." 74 Fed.Cl. at 275. To that end, the court relied upon materials submitted to Congress in support of the reduction which explained the rationale for an AAAF reduction for non-turnover units. *Id.* at 276; *see also Cathedral Square*, 2011 WL 43019, at *15–*17 (adopting the reasoning in the *Cuyahoga* and *Park Properties I* decisions); *Greenleaf*, 2010 WL 3894126, at *6 (same).

The new-form HAP contract does not include the language requiring publication in the *Federal Register* of the basis for AAAFs; rather, Section 2.7(b) of plaintiffs' HAP contract states, in pertinent part: "Contract Rents will be adjusted on the anniversary date of the contract in accordance with 24 CFR 888 and this Contract." JX 3 at 16 (§ 2.7(b)(1)). At the time the parties entered the HAP Contract in March of 1981, 24 C.F.R. § 888 provided: "[AAAFs] are used to adjust rents under the Section 8 Housing Assistance Payments Program." 24 C.F.R. § 888.201 (1980). The regulations specified

that "[t]he adjusted monthly amount of the Contract Rent of a dwelling unit shall be determined by multiplying the Contract Rent in Effect on the anniversary date of the contract by the applicable [AAAF]" published by HUD for the pertinent geographical region. 24 C.F.R. § 888.203(b) (1980). By its terms, 24 C.F.R. § 888 did not explicitly allow or disallow disparate AAAFs for non-turnover units at the time the parties entered the contract.

Nonetheless, Part 888 is placed in context by 42 U.S.C. § 1437f(c)(2)(A), the statutory provision which authorizes the Secretary to formulate AAAFs and for which 24 C.F.R. § 888 is the implementing regulation. When the parties entered the Contract, 42 U.S.C. § 1437f(c)(2)(A) provided:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract *to reflect changes in the fair market rentals* established in the housing area for similar types and sizes of dwelling units, *or, if the Secretary determines, on the basis of a reasonable formula.*

42 U.S.C. § 1437f(c)(2)(A) (1976 & Supp. V 1982) (emphasis added).[39] Plaintiffs thus contend that under the statute the Secretary was required to "base the [A]AAFs on a fair market basis or use a reasonable formula related to market data," and because the one-percent reduction rests on neither approach, it contravenes plaintiffs' Contract. Pls.' Mem. at 21–23. The government argues that the Secretary need not have provided a factual basis for its adoption of the one-percent reduction and even if the Secretary had been so required, the congressional record to the 1994 Amendments contains an adequate factual record. Def.'s Post–Trial Br. at 29–30.

The court in *Greenleaf* rejected similar arguments by plaintiffs, concluding that plaintiffs in reality were mounting "a challenge to a legislative classification drawn by Congress, which chose to add the .01 reduc-

---

**39.** The current version of this portion of 42 U.S.C. § 1437f(c)(2)(A) is identical to the quoted text.

tion." 2010 WL 3894126, at *7. The court found as well that "while the statute and regulations may require the [AAAFs] to be generally 'reasonable,' nothing in the Greenleaf [c]ontract makes [the Illinois Authority] responsible for the classification of units or for the [AAAFs] themselves" and "[the Illinois Authority] ha[d] not breached the Greenleaf [c]ontract by complying with the .01 [reduction]." *Id.* In *Cathedral Square,* the court summarized the *Greenleaf* court's findings and "adopt[ed] the same." 2011 WL 43019, at *17.

That HUD's implementation of the one-percent reduction flows from a congressional mandate does not insulate its actions nor prevent such actions from constituting a breach of contract. *First Nationwide Bank,* 431 F.3d at 1350 ("The issue is not whether Congress can enact legislation that abrogates or modifies existing government contracts; the issue is whether the government is liable for the consequences of such action. While a contract does not prevent Congress from enacting legislation, the government may incur liability for damages when the legislation materially affects performance of the contract."); *see also Mobil Oil Exploration & Producing Se., Inc. v. United States,* 530 U.S. 604, 607–08, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (quoting *United States v. Winstar Corp.,* 518 U.S. 839, 895, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality op.)) (internal quotation marks omitted).[40] Similarly, HUD may rely on congressional findings regarding the one-percent reduction, but those findings nonetheless must satisfy the contractual standards pertinent to HAP contracts. *See Mobil Oil,* 530 U.S. at 619–20, 120 S.Ct. 2423 ("[T]he fact that Interior's repudiation rested upon the enactment of a new statute makes no significant difference.").

In determining that the Secretary indeed provided adequate explanation for its adoption of the one-percent reduction, the court in

*Park Properties I* examined materials submitted by HUD to Congress which explained the rationale of the AAAF reduction. In particular, the court looked to a report by HUD entitled "Congressional Justifications for 1995 Estimates," which provided:

> Reduce AAF Rent Adjustment for "Stayers"—Based on the rationale that operating costs are less if tenant turnover is less, this proposal would limit the rent increase for Section 8 housing subject to an AAF to the full inflation adjustment minus one percentage point in those cases where the tenant stays in the same unit for 1 year. This includes section 202/811 projects. Savings are estimated at $77 million for fiscal year 1995.

JX 68 at 30 (Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations for 1995, Hearings Before a Subcomm. of the H. Comm. on Appropriations, 103d Cong., 2d Sess. 591 (1994) (HUD, "Congressional Justifications for 1995 Estimates") (March 1994)); *see Park Properties I,* 74 Fed.Cl. at 276. Senators Riegle and Sarbanes provided a fuller explanation for this provision upon introducing S.2049, from which the one-percent rule was eventually derived:

> For the section 8 new construction, substantial rehabilitation, moderate rehabilitation, LMSA, PD, and certificate programs, section 804 would amend section 8(c)(2)(A) of the 1937 Act to permit adjustment of contract rents using the published AAF, adjusted so that any rent increase would be one percentage point less than the adjustment based on the published factor, for any unit occupied by the same family at the time of the last contract rent adjustment.... This reduction for 'stayers' would only apply to contract rent adjustments that would otherwise be granted in full.

> Because the cost to owners of turnover-related vacancies, maintenance, and market are lower for long-term stable tenants, these tenants are typically charged less

---

**40.** The so-called "unmistakability doctrine" may, in certain cases, shield the government from breach of contract claims where the breach is attributable to a sovereign act, but the govern-

ment does not argue, nor can it successfully contend on the facts of this case, that the doctrine applies here. *See Cuyahoga I,* 57 Fed.Cl. at 764–77.

than recent movers in the unassisted market. Since HUD pays the full amount of any rent increases for assisted tenants in section 8 projects and under the Certificate program, HUD should expect to benefit from this 'tenure discount.' Turnover is lower in assisted properties than in the unassisted market, so the effect of the current inconsistency with market-based rent increases is exacerbated.

*Park Properties I,* 74 Fed.Cl. at 276 (quoting 140 Cong. Rec. 8659, 8693 (HUD, Explanation and Justification for the Housing Choice and Community Investment Act of 1994)). The government has not provided or cited to any additional materials regarding the rationale of the one-percent reduction.

The basic proposition that property owners incur lower costs for non-turnover units than turnover units is unremarkable and could be accepted as a matter of course without any detailed congressional findings on the subject. The problem, however, is that the one-percent figure that Congress chose in an effort to capture those diminished costs is not self-evidently market-based or reasonable. Nor is there any discussion whatsoever within the legislative history that addresses why one percent is the appropriate amount by which to reduce the AAAF for such units. From this dearth of explanation as to how the one-percent number was chosen, the salient question is whether the one-percent figure constitutes a "reasonable formula" even though it is only notionally based rather than premised on market data. There is no evidence before the court regarding the actual decreased costs of non-turnover units.

■ Even ignoring 42 U.S.C. 1437f, as the government urges, and examining plaintiffs' HAP Contract independently from the statutory scheme which governs it, the court remains unconvinced that the one-percent reduction is a "reasonable formula." "The absence ... of any specific limitation on [HUD's] discretion [to generate AAAFs] does not mean that [its] actions are free from

judicial scrutiny." *Thomas Creek Lumber & Log Co. v. United States,* 32 Fed.Cl. 787, 790 (1995), *aff'd,* 73 F.3d 379 (Fed.Cir.1995). To the contrary, "[i]t is a well-established principle of law that a 'party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.'" *American Exp. Isbrandtsen Lines, Inc. v. United States,* 499 F.2d 552, 576 (Ct.Cl.1974) (quoting *Pacific Far E. Line, Inc. v. United States,* 394 F.2d 990, 998 (Ct.Cl.1968)); *see also National Leased Hous. Ass'n v. United States,* 32 Fed.Cl. 762, 763 (1995) ("Where a contract grants ... discretion to make material determinations, a court ordinarily will not overturn that party's determination unless the determination is arbitrary and capricious."), *aff'd,* 105 F.3d 1423 (Fed.Cir.1997); *Park Vill. Apartments,* 32 Fed.Cl. at 447 n. 4 (same); *Thomas Creek,* 32 Fed.Cl. at 790 (same).

Conceptually, the one-percent figure could be based on rational reasoning derived from HUD's, or Congress', consideration of relevant factors as to diminished costs for non-turnover units. Nevertheless, the court is left with nothing that shows as much. In short, the congressional findings upon which HUD relies do not provide an adequate rationale for the one-percent figure such that the Secretary can be said to have satisfied its duty under 42 U.S.C. § 1437f to base AAAFs on market data or a reasonable formula. Nor can it be said that HUD exercised its contractual discretion in a non-arbitrary manner by adopting the one-percent reduction for non-turnover units.[41]

For these reasons, HUD has breached plaintiffs' HAP Contract with regards to one-percent AAAF reduction.

## IV. *THE OVERALL LIMITATION*

■ As originally enacted, 42 U.S.C. § 1437f(c)(2)(C) provided that "[a]djustments in the maximum rents [under subparagraphs (A) and (B)] shall not result in *material differences* between the rents charged for

---

41. The situation would be different if the parties had developed the one-percent reduction through an arm's length negotiation of a contract, or even where Congress or HUD had required such a provision for all newly entered contracts. It is

quite a different matter to alter unilaterally the terms of an existing contract by inserting such a provision over the objections of the party whose rights are being diminished.

assisted units and comparable unassisted units, as determined by the Secretary." (1976) (emphasis added). This overall limitation was implemented in plaintiffs' HAP Contract via Section 2.7(d), which states:

> Notwithstanding any other provision of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in *material differences* between the rents charged for assisted and comparable unassisted units, *as determined by HUD;* except to the extent that the differences existed with respect to the Contract Rents set at Contract execution or cost certification, where applicable.

JX 3 at 16 (emphasis added).

While the 1994 Amendments left 42 U.S.C. § 1437f(c)(2)(C) untouched textually, it added to Section 1437f(c)(2)(A) the following provision:

> [W]here the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor *exceeds the fair market rental for an existing dwelling unit in the market area,* the Secretary shall adjust the rent *only to the extent that the owner demonstrates* that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, 108 Stat. at 2315 (emphasis added). Again, HUD implemented this aspect of the 1994 Amendments via Notice 95–12, which stated in pertinent part:

> If current project rents on a . . . contract (before the application of the [A]AAF) are above the published [fair market rent] for the area[,] then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, [a rent comparability study]. . . .

JX 41 at 2–3.

Plaintiffs allege that the overall-limitation provision within their HAP Contract was superseded by the 1994 Amendments and thus is no longer effective. Pls.' Mem. at 9. Alternatively, plaintiffs argue that even if the overall limitation survived the 1994 legislation, HUD's failure to furnish plaintiffs with comparable rent studies pursuant to 42 U.S.C. § 1437f(c)(2)(C) precludes the government's invocation of that provision. *Id.* Defendant contends that "HUD's definition and application of the [o]verall [l]imitation [c]lause do not breach the contract" because HUD reasonably exercised the discretion delegated to it under Section 2.7(d) of the HAP contract. *See* Def.'s Post–Trial Br. at 31.

In *Statesman II,* the court considered an argument similar to the current plaintiffs' secondary argument, *i.e.,* the contention that because the government did not generate comparability studies, but rather relied on the 1994 Amendments for enforcement of the overall limitation, the cap had not been invoked properly by HUD. 71 Fed.Cl. at 666–67. There, plaintiffs contended that the overall limitation could not be invoked by HUD to later limit plaintiffs' damages. *Id.* The court rejected the plaintiffs' position, refusing to "read a term out of the contract because the government misapplied that term" and noting that failure to apply the overall-limitation clause to the damages calculation would have placed plaintiffs in a better position than they would have held had the breach not occurred. *Id.* at 667. The court then proceeded to apply the overall-limitation cap to plaintiffs' damages award, concluding that a twenty-percent difference would have been considered material under that provision. *Id.* at 669.

Two years later, Judge Allegra faced this issue and focused on a question not addressed by the court in *Statesman II* but raised now by way of the present plaintiffs' first argument: *viz.* whether "the repudiation of the original overall limitation clause waived or eliminated the limitation altogether." *Park Properties II,* 82 Fed.Cl. at 168. Using an extended hypothetical, Judge Allegra concluded that the overall-limitation provision in the statute and contract did not survive the 1994 Amendments, and that "repudiation of the original overall-limitation clause prevents [the government] from rely-

ing on that clause in seeking to limit its liability for increased rents." *Id.* at 173. The court first observed that "[t]he original overall limitation clause in the HAP contracts was not self-executing[; r]ather it required HUD to take affirmative steps to invoke the clause." *Id.* at 169. "If HUD did not take this action, the increased rents, derived using the AAAFs, automatically took effect." *Id.* Because Congress believed that HUD was not invoking the overall-limitation clause with sufficient frequency, "Congress enacted the 1994 [A]mendments, which precluded HUD from adjusting the rents unless the owner demonstrated" that the adjusted rent would not exceed the comparable market rent. *Id.* Judge Allegra concluded that "[t]he amendments not only sought to impose new requirements on the property owners, but also had the effect of precluding HUD from invoking the clauses originally included in the HAP contracts." *Id.*

Relying on the prevention doctrine, Judge Allegra held that because "[t]he United States, through Congress' passage of the 1994 [A]mendments, effectively prevented HUD from invoking [the overall limitation] clause on behalf of the United States[,] ... [the government] prevented a condition precedent from occurring that might or might not have limited its liability in this breach action." *Id.* at 172. This prevention precluded the government from invoking the overall limitation clause to cap its liability to plaintiff. *Id.* at 172–73.[42]

Plaintiffs urge the court to reconsider its prior holding in *Statesman II* in light of Judge Allegra's analysis in *Park Properties II.* Pls.' Mem. at 30. After careful consideration of the issue and the *Park Properties II* opinion, the court is persuaded that adoption of Judge Allegra's detailed analysis in that case is proper.

As Judge Allegra noted, "[a]pplication of the prevention doctrine here fulfills the twin rationales underlying the doctrine," *i.e.,* first, the principle that a breaching party may not benefit from its breach and, second, "the implied agreement of the parties not to hinder performance of a contract." 82 Fed.Cl. at 173. What is more, reconstruction of the overall limitation years after it may, or may not, have been invoked by HUD is problematic in light of the significantly changed circumstances surrounding the HAP Contract, most particularly the 1994 Amendments which the court has concluded constituted a breach of plaintiffs' HAP Contract. The uncertainty surrounding the overall-limitation clause is exacerbated by the remarkably inconsistent pre–1994 HUD interpretations as to what constituted a "material difference." *See Statesman II,* 66 Fed.Cl. at 621–24. Most importantly, however, the court is convinced that, as matter of law, the overall-limitation clause did not survive the 1994 Amendments. Accordingly, that provision will not serve as a cap on plaintiffs' damages.

### V. *THE 60–DAY REQUIREMENT*

Finally, plaintiffs contend that HUD's requirement that owners request rent adjustments (along with the submission of comparability studies) at least 60 days prior to the contract anniversary date constitutes a breach of contract. *See* Pls.' Post–Trial Br. at 19–20.[43] The government contends that HUD "reasonably exercised its discretion to impose a 60–day deadline for requesting contract rent adjustments." Def.'s Post–Trial Br. at 22.

■■■ Similar to the one-percent reduction, the contract is silent on the timing of requests. HUD thus had administrative discretion to impose reasonable restrictions regarding the submission of rent requests, so

---

**42.** Notably, in *Cuyahoga II,* a decision rendered by Judge Allegra before both *Statesman II* and *Park Properties I & II,* the parties agreed that the overall limitation should apply even though HUD did not prepare comparability studies. 65 Fed. Cl. at 543.

**43.** Plaintiffs appear to argue that the 60–day requirement was a breach of contract as both a stand-alone claim, *see* Pls.' Post–Trial Br. at 19–

20, and as a defense to their nonperformance of the condition precedent by arguing that their belated rent requests should be accepted notwithstanding the requirement, *see* Pls.' Post–Trial Reply Br. at 13–15. The court will not address plaintiffs' latter argument, as it has already concluded that plaintiffs' non-performance of the condition precedent was excused on alternative grounds.

long as such imposition was neither arbitrary nor capricious. *See American Export,* 499 F.2d at 576; *Thomas Creek,* 32 Fed.Cl. at 790; *National Leased Hous.,* 32 Fed.Cl. at 763. While prior decisions of this court have determined that the sixty-day limitation breached the old-form HAP contract, *Cuyahoga I,* 57 Fed.Cl. at 762, that conclusion was predicated upon the fact that property owners subject to the old-form HAP contract were not required to initiate rent requests at all. In those cases, any imposition upon owners of first requesting adjustments would be contrary to the terms of the contract; thus, the 60–day limitation for submitting such requests would be an impermissible extension of that burden. Where, however, an owner is required to request the adjustment, as here, HUD's policy of obligating owners to submit such requests within a reasonable time period of the adjustment's effective date does not abrogate any prior right of the property owners under the new-form HAP contract. Indeed, the language of the Contract itself indicates that plaintiffs would be required to initiate rent requests at some time *before* the contract anniversary date. *See* JX 3 at 16 (§ 2.7(b)(1)) ("*Upon request from the Owner* to the C[ontract] A[dministrator], Contract Rents will be adjusted *on the anniversary date of the Contract....*") (emphasis added).

HUD's selection of 60 days as the relevant window of time for processing rent adjustment requests is similarly reasonable and not arbitrary. HUD indicated that "you need about a month to process an adjustment when a rent study is not required ... [and] ... you need about two months to process an adjustment when a rent study is required." JX 47 at 288 (Section 8 Annual Rent Adjustment and Comparability Reviews, Instructions for Contract Administrators for Section 8 New Construction and Substantial Rehabil-

itation Projects, Transcripts of Videotapes Developed by HUD (Oct. 1987)). Importantly, these estimations regarding the time required for processing rent adjustments were generated prior to the 1994 Amendments, and thus speak to the appropriate processing time pre-breach.

Plaintiffs take issue with HUD's imposition of the 60–day limitation in the "midstream" of contract performance. *See* Pls.' Post–Trial Br. at 20. While the 60–day limitation contained within Notice 95–12 did not come about until 1995, evidence provided at trial demonstrates that HUD always had some policy in place governing the timing of rent adjustment requests. In a 1986 internal memorandum, HUD dictated to its agents that for owners subject to new-form HAP contracts:

> If the owner submits a request for an annual adjustment less than 60 days before the HAP contract anniversary date or after the anniversary date, implement the new rents according to the following schedule. Make rent reductions effective the first day of the month that begins 60 days after the date of your decision letter.... Make rent increases effective no later than the first day of the month which falls 30/60 days after the date you received the owner's request. Use 30 days if no market analysis is performed. Use 60 days if a market analysis is performed.

JX 44 at 149–50 (Jan. 14, 1986) (capitalization removed). So long as plaintiffs received adequate notice of such requirement—which they did through Notice 95–12—and the requirement itself was reasonable, it fits within the boundaries of the administrative discretion HUD possesses.[44]

## CONCLUSION

For the reasons stated, the court finds (1) that Haddon Associates is a proper party

---

**44.** In cases in which statutory rights were at issue, similar cut-off dates for agency performance were held to be reasonable so long as adequate notice was provided. *See, e.g., JEM Broad. Co. v. Fed. Commc'ns Comm'n,* 22 F.3d 320, 328–29 (D.C.Cir.1994) (agency imposition of a 30–day cut-off date after which applications failing to meet specified criteria would be dismissed without a hearing was a reasonable limitation on a statutory right to a hearing so long as

the applicant received adequate notice of the rule); *Charlotte Hous. for Elderly v. Cuomo,* 89 F.Supp.2d 70, 73, 76–77 (D.D.C.2000) (HUD's requirement that Section 8 owners submit vouchers within 60 days of eligibility notice to receive right to retroactive rent adjustments under statute was reasonable where ample time was provided for compliance and notice of time limit was provided).

plaintiff, (2) that the 1994 Amendments and HUD's actions pursuant to that legislation, including its issuance of Notice 95–12 and subsequent implementation, effectuated a breach of plaintiffs' HAP Contract, and (3) that the government is liable for the breach. In particular, the court concludes that HUD's imposition upon plaintiffs of the requirement of submitting a rent comparability study attendant to requests for annual rent adjustments, and its denial of rent adjustments on the basis of plaintiffs' failure to supply such studies, constituted partial breaches of contract. In addition, the one-percent AAAF reduction for non-turnover units further contravened plaintiffs' Contract.

The parties are directed to file a joint status report on or before July 8, 2011, proposing a plan and schedule to resolve damages.[45]

It is so ORDERED.

45. The government's procedural motion for leave to file an objection to plaintiffs' post-trial reply brief is DENIED as moot.